IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

**SHARON R. BAKER,**

    Plaintiff,

v.

**ECHOSTAR COMMUNICATIONS CORPORATION and ECHOSPHERE, LLC,**

    Defendants.

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

Plaintiff, Sharon R. Baker ("Ms. Baker" or "Plaintiff"), by her undersigned counsel, complains against Defendants, EchoStar Communications Corporation and EchoSphere, LLC (collectively "EchoStar") as follows:

**PARTIES**

1. Ms. Baker, at all times material hereto, was a female citizen of the United States of America and the State of Colorado.

2. Ms. Baker was an employee of EchoStar from November 1998 through July 2004, providing services to both EchoStar Communications Corporation and EchoSphere, LLC.

3. EchoStar Communications Corporation is a for-profit corporation incorporated in the State of Nevada with a principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado 80112.

4. EchoSphere, LLC is a limited liability company formed under the laws of Colorado with a principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado 80112.

5. T. Wade Welch and David Noll are individuals and attorneys who practice law with a business address at the law firm of T. Wade Welch & Associates at 2401 Fountainview, Suite 700, Houston, Texas, 77058, and at all times hereto with respect to relevant allegations, Mr. Welch and Mr. Noll acted as agents of EchoStar.

6. T. Wade Welch interacted with Ms. Baker in the state of Colorado as an agent of EchoStar.

7. At all times material hereto, EchoStar was an employer in the State of Colorado within the meaning of 42 U.S.C. § 2000e(b).

8. For purposes of Plaintiff's claims under 42 U.S.C. § 2000e ("Title VII"), EchoStar Communications Corporation and EchoSphere, LLC are joint employers or constitute an integrated enterprise or single employer within the legal meanings of those terms as defined by law.

9. EchoStar Communications Corporation and EchoSphere, LLC share centralized control over their labor relations and share common business operations, common and centralized management and common ownership and financial control.

**JURISDICTION AND VENUE**

10. This Court has original jurisdiction of the subject matter asserted by the allegations contained in the complaint pursuant to 28 U.S.C. §§ 1331, 1332, 1343(a)(4), and 42 U.S.C. § 2000e-5(f)(3). The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11. The acts complained of herein were committed, or had their principal effect within the District of Colorado, and therefore venue for this civil action is proper pursuant to 28 U.S.C. §§ 1391(b)(e) and 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3).

## ADMINISTRATIVE PROCEDURES

12. Ms. Baker has fully complied with all administrative prerequisites of jurisdiction in this Court under Title VII.

13. On April 27, 2005, Ms. Baker filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge Number 320-2005-01706.

14. On March 16, 2006, Ms. Baker received a Notice of Right to Sue from the EEOC.

15. Plaintiff has exhausted all administrative remedies and this action is timely filed.

## FACTUAL ALLEGATIONS

16. Ms. Baker incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 15 above, with the same force and effect as if fully set forth herein.

17. Ms. Baker began working for EchoStar on November 2, 1998 as the Executive Assistant to Soraya Hesabi-Cartwright, Executive Vice President Dish Network.

18. Ms. Baker's job duties as the Executive Assistant included managing the administrative staff for nine of the customer service centers and managing all the vendors and programmers.

19. Ms. Baker oversaw all the employee incentives for the customer service centers.

20. Ms. Baker was also the Executive Assistant to the executive team for quarterly and annual meetings, including the Executive Vice Presidents and the Chief Executive Officer, Mr. Charlie Ergen.

21. Ms. Baker received the President's Choice for Distinguished Service Award in January 2004 for service she performed in 2003, as well as three other Distinguished Service Awards during her tenure at EchoStar.

22. During her employment at EchoStar, Ms. Baker was never disciplined.

23. During her employment at EchoStar, Ms. Baker was an exemplary employee.

24. Ms. Baker received approximately a five thousand dollar raise in the spring of 2004 based on her performance in 2003.

25. In January 2004, Michael Kelly replaced Ms. Cartwright as the Executive Vice President Dish Network.

26. In January 2004, Ms. Baker began reporting to Michael Kelly and working in EchoStar's executive suite.

27. In 2004 when Mr. Kelly became her supervisor, Ms. Baker experienced an extreme change in her work environment that was hostile toward her and discriminatory.

28. After Mr. Kelly became her supervisor, Ms. Baker's job responsibilities as the Executive Assistant were drastically reduced. Among other things, she no longer had the ability to reserve a conference room, schedule meetings or order supplies. She did not have Internet access.

29. The executive suite was an environment in which management tolerated yelling and screaming towards employees, including profane and vulgar language.

30. During the time that Ms. Baker reported to Mr. Kelly, she was subjected to profane, hostile and abusive behavior from Mr. Kelly directed at Ms. Baker. This included being subjected to sexual jokes about females and the female anatomy and a continuing pattern of crude, rude and insolent behavior.

31. At a meeting among several Vice Presidents, including Mr. Kelly, Ms. Baker heard Robert Kondales, a Vice President of Customer Service Centers, ask Suzanne Beall, Vice President of Customer Service Centers, "How she liked her d _ _ _? On a hoagie or a bun?"

32. Ms. Baker heard Mr. Kelly make comments about a female's breasts coming out of her shirt.

33. On many occasions, Mr. Kelly would tell sexual jokes during meetings or in conversations with other men.

34. In one meeting, Mr. Kelly made sexual comments about three stewardesses on an airplane and about a woman's body.

35. Mr. Kelly called Ms. Baker "f___ing stupid" for sending an email authorized by the Vice President of Human Resources and yelled at her for several minutes.

36. Other employees heard Mr. Kelly say to Ms. Baker "You're f___ing stupid. You're a f___ing idiot."

37. On other occasions, Mr. Kelly yelled and screamed at Ms. Baker calling her a "f___ing bitch."

38. While employed at EchoStar, Ms. Baker heard many comments made by Michael Dugan, President of EchoStar, about the sizes or shapes of women's breasts.

39. Mr. Dugan would comment about the cute little bodies of employees or boast about being able to look up a lady's dress as she climbed the stairs.

40. On another occasion, Mr. Dugan talked about an orgasm he almost had when a well-known actress visited the EchoStar offices regarding a marketing promotion.

41. Mr. Dugan boasted about his trip to the Playboy mansion and the women's bodies, breast sizes and nudity. Ms. Baker heard Mike Dugan make comments about an assistants "big butt."

42. Mr. Kelly also made derogatory comments to Ms. Baker about attending doctor appointments related to her injury of carpel tunnel syndrome.

43. Despite being paid as an exempt and salaried employee, Ms. Baker was questioned about when she would return and how she was going to make up work for attending one of her doctor appointments.

44. Other administrative assistants were not questioned, and they were free to come and go, including going to hair appointments without the requirement to make up work hours.

45. Mr. Kelly suggested to Ms. Baker that employees schedule doctor appointments on Saturdays and not during business hours.

46. On several occasions when Ms. Baker said she had a doctor appointment or a therapy appointment, Mr. Kelly would ask "What's wrong with you? What's wrong with you? What's wrong with you?"

47. Ms. Baker first complained about Mr. Kelly's actions to Mr. Scarborough, Senior Vice President of Human Resources and Corporate Communications, in March 2004.

48. Mr. Scarborough talked with Mr. Kelly about Ms. Baker's complaint.

49. After Mr. Scarborough spoke with Mr. Kelly about Ms. Baker's complaint, Mr. Kelly came up to Ms. Baker and said, "Well, I understand I pissed little Sharon off today. I guess I shouldn't have pissed little Sharon off. I didn't mean to make little Sharon mad."

50. Ms. Baker complained eight or more times to Mr. Scarborough about Mr. Kelly's conduct, her working conditions, and the hostile environment.

51. Ms. Baker was also present when Sheila Tomasek made a comment to John Scarborough about the hostile environment and treatment of another assistant in the executive suite.

52. Ms. Baker also complained to other employees in EchoStar's Human Resources department and officers of EchoStar.

53. In testimony before the Colorado Department of Labor and Employment, Unemployment Compensation Division, Mr. Scarborough agreed that Ms. Baker frequently complained about Mr. Kelly's sexual harassment and insolent rude behavior.

54. Despite Ms. Baker's continued complaints, Mr. Kelly's behavior toward Ms. Baker did not improve during the time she was supervised by him.

55. EchoStar did not discipline Mr. Kelly for his improper conduct towards Ms. Baker.

56. Ms. Baker requested a job transfer from Mr. Scarborough. She found two separate job openings at EchoStar for which she was qualified and requested that Mr. Scarborough permit her transfer.

57. Mr. Scarborough refused to permit the transfer to either position.

58. As a result of her complaints against Mr. Kelly and EchoStar for a hostile work environment, EchoStar's failure to correct the situation, EchoStar's and Mr. Kelly's subsequent retaliation against her, and the reduction in her job duties, on July 7, 2004 Ms. Baker submitted her notice of intent to resign letter, to be effective July 21, 2004.

59. Ms. Baker was planning on taking a vacation from July 15 through July 21, 2004, the last week of her work.

60. On Tuesday, July 13, 2004, Ms. Baker received a telephone call from David Noll, an attorney for T. Wade Welch & Associates.

61. Mr. Noll requested that Ms. Baker provide an affidavit about her former supervisor Soraya Hesabi-Cartwright's charge of discrimination against EchoStar.

62. Each time Ms. Baker answered a question, Mr. Noll attempted to rephrase and revise her answer so that her response would become either untruthful or a mischaracterization or misstatement of her response.

63. Ms. Baker disagreed with Mr. Noll's re-phrasing of her statements and she then requested the assistance of an attorney for her to provide a statement. Mr. Noll stated that she didn't need an attorney.

64. On July 14, 2004, days after she submitted her notice of intent to resign, Mr. Scarborough said he had finalized the details of a new position for Ms. Baker and asked her to meet with him at 2 p.m. to discuss those details.

65. Ms. Baker agreed to meet with Mr. Scarborough because she desired to escape the hostile working environment but continue working with EchoStar.

66. Mr. Scarborough never showed up for the 2 p.m. meeting.

67. At approximately 2:20 p.m., T. Wade Welch, an attorney from Houston, Texas confronted Ms. Baker at her desk.

68. Mr. Welch stated that Ms. Baker needed to provide an affidavit prepared by Mr. Noll before she left on vacation.

69. Ms. Baker said that Mr. Noll's phrasing of her statements were inaccurate and that she wanted an attorney to assist her.

70. Mr. Welch then yelled and screamed at Ms. Baker stating what she saw Ms. Cartwright experience with her treatment by Mr. Ergen was not discrimination, that her recollection was not accurate, and that she didn't need an attorney.

71. Mr. Welch continued to yell at Ms. Baker and threatened that her vacation would be interrupted if she didn't sign the affidavit prepared by Mr. Noll.

72. Mr. Welch pounded his fist on the fax machine next to Ms. Baker's desk.

73. Mr. Welch demanded that Ms. Baker sign the affidavit prepared by Mr. Noll regarding her former supervisor Soraya Hesabi-Cartwright's charges of discrimination against EchoStar before she left the building.

74. Mr. Welch repeated his statement to Ms. Baker that nothing that she had seen or observed could ever be considered illegal gender discrimination and she should state so in the affidavit.

75. Ms. Baker believed Mr. Welch's statements to be untrue. Ms. Baker believed that she had observed and experienced illegal gender discrimination and sexual harassment.

76. Mr. Welch again yelled at Ms. Baker and threatened that she needed to complete the affidavit that would be faxed from Mr. Noll within the hour before she could leave the building.

77. Mr. Welch said he would be back in an hour and that he would have Mr. Noll call her and fax the affidavit to her.

78. At all times material hereto, Mr. Welch and Mr. Noll acted as agents of EchoStar.

79. Ms. Baker had no choice but to leave work instead of providing a false affidavit to Mr. Welch.

80. Ms. Baker was shaking and trembling and extremely upset and crying and she called Kathy Smith, Executive Assistant to escort her out of the building.

81. Ms. Baker was disoriented when she left the building and had difficulty locating her car in the parking lot.

82. Ms. Baker was constructively discharged from EchoStar due to EchoStar's severe and pervasive sexual harassment, retaliation, gender discrimination and threatening behavior.

83. EchoStar distributed an employee handbook, which included a policy titled Protection from Unlawful Harassment.

84. EchoStar's Protection from Unlawful Harassment Policy stated that it protected employees from retaliation if a good faith complaint of harassment or discrimination was made.

85. EchoStar had a handbook policy titled Threats and Violence.

86. EchoStar's Threats and Violence policy stated that intimidation and threats will not be tolerated.

87. EchoStar has corporate policies which prohibit harassment based on gender. Specifically, the Equal Employment Opportunity Policy states that harassment includes "verbal or physical conduct which has the purpose or effect of substantially interfering with an individual's work performance, or creating an intimidating, hostile or offensive work environment."

88. The Equal Employment Opportunity Policy states that it "applies to all employees including managers, supervisors, and co-workers."

89. The Equal Employment Opportunity Policy states that, "EchoStar prohibits retaliation against any employee for filing a complaint under this policy or for assisting in a complaint investigation. If you believe there has been a violation of this EEO policy, immediately report the incident to your supervisor and/or your Human Resources representative. They will investigate the matter and take appropriate corrective action."

90. The EchoStar Employee Handbook makes a statement under its Threats and Violence section that "EchoStar seeks to maintain a work environment free from

intimidation, threats, or violent acts. This includes, but is not limited to, intimidating, threatening or hostile behaviors, physical abuse…"

91. The Threats and Violence section of EchoStar's Employee Handbook also states: "All employees, including supervisors and temporary employees, should be treated with courtesy and respect at all times. If an employee feels he/she or any co-worker has been subjected to any of the behaviors listed above, he/she is requested to immediately report the incident to a supervisor or the Human Resources Department. EchoStar promptly and thoroughly investigates all reports of threats of (or actual) violence or other conduct that is in violation of these guidelines, is subject to prompt disciplinary action up to and including termination of employment."

92. EchoStar stated through its corporate officers, Vice Presidents and managers, that it was committed to the implementation of its policies.

93. EchoStar stated through its corporate officers, Vice Presidents, and managers that employees could count on the protection of its policies in the handbook.

**FIRST CLAIM FOR RELIEF**
**(Hostile Work Environment Sexual Harassment under Title VII against EchoStar)**

94. Ms. Baker incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 93 above, with the same force and effect as if fully set forth herein.

95. Ms. Baker is a female, and thus a member of a protected class.

96. Ms. Baker was subject to unwelcome sexual harassment consisting of a profane, hostile and abusive work environment.

97. The harassment was based on sex.

98. The harassment was sufficiently severe and pervasive so as to alter the conditions of Ms. Baker's employment and to create an abusive environment.

99. Despite Ms. Baker's complaints, the harassment persisted unabated.

100. Ms. Baker suffered an adverse, tangible employment action.

101. EchoStar is liable since it knew or should have known of the harassment and failed to take remediation. EchoStar, either directly or by and through its employees and agents, created a hostile work environment involving sexual harassment, wherein Ms. Baker suffered the injuries mentioned herein.

102. As a proximate result of EchoStar's unlawful and intentional conduct, Ms. Baker has suffered, is now suffering, and will continue to suffer lost wages, benefits, emotional distress, mental anguish, humiliation, loss of reputation and other economic and non-economic losses.

**SECOND CLAIM FOR RELIEF**
**(Sex Discrimination under Title VII against EchoStar)**

103. Ms. Baker incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 102 above, with the same force and effect as if fully set forth herein.

104. EchoStar has discriminated against Ms. Baker in the terms and conditions of her employment on the basis of her sex in violation of Title VII, 42 U.S.C. § 2000e-2, including but not limited to the following:

    a. Illegally treating Ms. Baker disparately because she is a female.

    b. Failing and refusing to take action to correct the effect of the discriminatory policies and practices complained of herein, and/or failing to follow any corrective action policies.

  c. EchoStar's acts were intentional, malicious and practiced with reckless indifference to Ms. Baker's federally protected civil rights.

  105. At all times during her employment, Ms. Baker was performing at or above the level of EchoStar's reasonable expectations. Despite Ms. Baker's qualifications and performance, she was discriminated against because of her sex.

  106. EchoStar is liable for the acts and omissions of its agents and employees. EchoStar, either directly or by and through its employees and agents, discriminated against Ms. Baker on the basis of her sex, wherein Ms. Baker suffered the injuries mentioned herein.

  107. As a proximate result of EchoStar's unlawful and intentional conduct, Ms. Baker has suffered, is now suffering, and will continue to suffer lost wages, benefits, emotional distress, mental anguish, humiliation, loss of reputation and other economic and non-economic losses.

## THIRD CLAIM FOR RELIEF
### (Retaliation under Title VII against EchoStar)

  108. Ms. Baker incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 107 above, with the same force and effect as if fully set forth herein.

  109. Agents and employees of EchoStar inflicted sex harassment and hostile work environment sexual harassment upon Ms. Baker in direct violation of Title VII.

  110. Ms. Baker complained of the discrimination she was subjected to at EchoStar.

  111. Ms. Baker acted as a witness in relation to another employee's protected activity.

112. After Ms. Baker's complaints, EchoStar did not remediate the conditions to which Ms. Baker complained.

113. After Ms. Baker made statements regarding treatment of another employee, she was retaliated against.

114. When such discrimination and retaliation became intolerable, Ms. Baker was forced to resign her position.

115. After Ms. Baker complained, EchoStar subjected her to more severe harassment.

116. A casual connection exists between Ms. Baker's complaint of discrimination and her constructive discharge.

117. EchoStar is liable for the acts and omissions of its agents and employees. EchoStar, either directly or by and through its employees or agents, retaliated against Ms. Baker and caused her severe injuries, as mentioned herein.

118. As a proximate result of EchoStar's unlawful and intentional conduct, Ms. Baker has suffered, is now suffering, and will continue to suffer lost wages, benefits, emotional distress, mental anguish, humiliation, loss of reputation and other economic and non-economic losses.

### FOURTH CLAIM FOR RELIEF
### (Breach of Contract against EchoStar)

119. Ms. Baker incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 118 above, with the same force and effect as if fully set forth herein.

120. EchoStar promulgated written policies and procedures in its Employee Handbook, which EchoStar distributed to all of its employees.

121. Ms. Baker received an Employee Handbook containing the policies and procedures of EchoStar upon beginning her employment at EchoStar and subsequent revisions to the Employee Handbook thereafter.

122. EchoStar's Employee Handbook contains corporate policies prohibiting harassment and retaliation for complaining about harassment or discrimination.

123. The Employee Handbook, and the policies and procedures contained therein constitute an implied contract between EchoStar and its employees.

124. Ms. Baker accepted the Employee Handbook and the policies and procedures contained therein as a contract between EchoStar and herself and provided consideration by continuing to work for EchoStar.

125. EchoStar never effectively disclaimed its contractual obligations to Ms. Baker.

126. EchoStar breached its contractual obligations to Ms. Baker by permitting harassment and retaliation against Ms. Baker.

127. As a direct and proximate result of EchoStar's breach of contract, Ms. Baker has suffered and will continue to suffer a loss of wages and benefits, the ability to earn wages in the future, as well as emotional distress and mental anguish.

**FIFTH CLAIM FOR RELIEF**
**(Outrageous Conduct against EchoStar)**

128. Ms. Baker incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 127 above, with the same force and effect as if fully set forth herein.

129. EchoStar, by its actions and those of Mr. Welch and Mr. Noll as agents of EchoStar, engaged in extreme and outrageous conduct on July 14, 2004 when he told

Plaintiff that she had not witnessed any sexual harassment and she could not leave the building until she signed a false affidavit which was prepared by Mr. Noll.

130.  Mr. Welch and attorney David Noll insisted that Ms. Baker give a false affidavit.

131.  Mr. Welch and Mr. Noll acted recklessly or with the intent of causing Plaintiff severe emotional distress.

132.  Upon information and belief Mr. Welch and Mr. Noll acted with express, apparent or inherent authority as agents of EchoStar.

133.  EchoStar's actions and Mr. Welch's conduct caused Plaintiff severe emotional distress, and she felt she had no choice but to leave the EchoStar building, or give a false affidavit.

134.  Plaintiff is entitled to damages for her mental pain and suffering, emotional stress, fear, anxiety, embarrassment and humiliation.

**WHEREFORE**, Plaintiff respectfully requests the Court to find in her favor and against EchoStar, and grant the following relief:

1.  Declare that Defendants' acts and practices complained of herein are in violation of Title VII and constituted intentional and/or willful conduct by Defendants;

2.  Enjoin and permanently restrain these violations of Title VII;

3.  Direct Defendants to take affirmative steps as are necessary to ensure that the effects of these unlawful employment practices and tortuous conduct are eliminated from its workplace;

4. Award Plaintiff back pay and actual damages in an amount to be determined at trial to compensate her for lost wages, benefits and employment opportunities;

5. Award Plaintiff compensatory damages for her emotional distress, pain, suffering and mental anguish;

6. Order Defendants to pay punitive damages to Plaintiff in amounts to be determined at trial, as punishment for Defendants' intentional conduct carried out with malice or reckless disregard for Plaintiff's federally protected rights;

7. Award Plaintiff a sum of monies to offset the taxable effect of her damage award;

8. Retain jurisdiction of this matter to ensure full compliance with the Orders of this Court;

9. Award Plaintiff reasonable attorneys' fees and costs of this litigation together with reasonable expert witness fees as provided by law;

10. Award Plaintiff pre-judgment and post judgment interest; and

11. Grant such other and further relief as this Court deems necessary and proper.

### Demand for Jury Trial

Plaintiff, Sharon R. Baker, hereby demands a trial by jury.

Respectfully submitted this 9th day of June 2006.

<u>s/ Robert J. Truhlar</u>
***Robert J. Truhlar***
TRUHLAR AND TRUHLAR, LLP
7340 E. Caley Avenue
Suite 310
Centennial, CO 80111
Telephone: (303) 794-2404
Fax: (303) 794-1142
Email: RobertTruhlar@worldnet.att.net
Attorney for Plaintiff

<u>s/ Thomas J. Arckey</u>
***Thomas J. Arckey***
ARCKEY & REHA, L.L.C.
26 West Dry Creek Circle
Suite 800
Littleton, Colorado 80120
Telephone: (303) 798-8546
Fax: (303) 798-4637
Email: tja@arlaw.us
Attorney for Plaintiff