**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 06-cv-01103-PSF-BNB

SHARON R. BAKER,

                Plaintiff,

v.

ECHOSTAR COMMUNICATIONS CORPORATION; ECHOSPHERE, L.L.C.; and
ECHOSTAR SATELLITE, L.L.C.,

                Defendants.

---

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

---

      Defendants, EchoStar Communications Corporation, EchoSphere, L.L.C. and EchoStar Satellite, L.L.C. (collectively "EchoStar"), through their undersigned counsel, submit the following brief in support of their Motion for Summary Judgment.

**<u>INTRODUCTION</u>**

      This is a case about a tough – but not illegal – work environment.  Plaintiff has alleged that yelling, profanity, and a few crude comments constitute sexual harassment and discrimination; but as a matter of law, they do not.  The United States Supreme Court, the Tenth Circuit, and this Court all hold that Title VII is not a civility code.

## FACTUAL BACKGROUND

Plaintiff worked for EchoStar Satellite, L.L.C.[1] from mid-November 1998, through mid-July 2004 as an Executive Assistant.  In early 2004, Plaintiff's supervisor and close friend, Soraya Hesabi-Cartwright, resigned from EchoStar, and Plaintiff was assigned to work for Michael Kelly.  Mr. Kelly was a self-sufficient and results-driven executive; he did not require the level of support that Plaintiff had grown accustomed to under Mrs. Cartwright's direction.  Plaintiff began complaining (immediately) that she was underutilized, although Plaintiff did not experience any change in her job title, benefits or pay under Mr. Kelly.  To the contrary, Plaintiff received a raise while working for Mr. Kelly.

Plaintiff began working with John Scarborough, Senior Vice President of EchoStar's Human Resources, in order to explore a transfer to another position in EchoStar.  Before a transfer could be finalized, however, Plaintiff left EchoStar on July 14, 2004.  (Plaintiff subsequently went to work for Mrs. Cartwright at Mrs. Cartwright's new business).  On July 7, 2004, Plaintiff submitted a written notice of resignation, stating that her last day at EchoStar would be July 21, 2004.  She then arranged to take July 15 through July 21 as vacation.  Her resignation letter does not mention any issues with her work assignment or environment.  In fact, Plaintiff thanked Mr. Kelly "for the opportunity to work for an exciting company."  Plaintiff's resignation letter was addressed to Mr. Kelly, but Mr. Kelly had left the country two weeks beforehand - in June 2004 - on a family vacation to Africa, and was not due to return to the office until after Plaintiff's last day at EchoStar.  Although Plaintiff subsequently claimed that

---

[1]  Pursuant to the parties' Stipulation (Dkt. No. 39), all three Defendants may be held jointly and severally liable for payment of any judgment in favor of Plaintiff.  Stip. ¶ 2.  That Stipulation also provides that it "shall not be construed as an admission that Defendants committed any wrongdoing, that they are liable to Plaintiff or that any judgment . . . is appropriate.  Rather Defendants expressly deny Plaintiff's claims."  *Id.*

Mr. Kelly was responsible for creating a hostile work environment, discriminating and retaliating against her, thereby forcing a constructive discharge, Mr. Kelly was not even on the same continent in the weeks preceding Plaintiff's departure.   The other individual whom Plaintiff claims treated her inappropriately, Michael Dugan, was not her supervisor, did not provide any input into Plaintiff's job assignments or reviews, and had retired from EchoStar months beforehand.

According to Plaintiff's notice, her last day of work was intended to be (and in fact was) July 14, 2004.  That same day Mr. Scarborough was to meet with Plaintiff in the afternoon about a possible transfer.  Before he could meet with her, Plaintiff left.  Plaintiff had a dispute with EchoStar's outside counsel from Texas, David Noll and Wade Welch, in the afternoon of July 14th, but no one at EchoStar knew about this confrontation until after Plaintiff threatened legal action and made a demand for settlement.  This is because Plaintiff left the building, and after screaming profanity herself, went to happy hour at a local bar with her co-workers.  That evening and in the following days, Mr. Scarborough called Plaintiff attempting to discuss another position.  Plaintiff refused to talk with Mr. Scarborough; she instead brought this suit.

## SUMMARY OF LEGAL ARGUMENT

As a matter of law, Plaintiff cannot prove:

(1) harassment based on gender;

(2) harassment that was severe and pervasive;

(3) a *prima facie* case of discrimination (there was no adverse employment action);

(4) that Defendants' actions were a pretext for gender discrimination;

(5) a *prima facie* case of retaliation (there was no materially adverse action);

(6) sufficiently definite or binding promises to support her breach of contract claim; or

(7) that Defendants engaged in extreme and outrageous conduct.

## STATEMENT OF UNDISPUTED FACTS

For purposes of this Motion only, the following facts are undisputed:

### Plaintiff's Legal Claims

1.     On August 28, 2006, Plaintiff filed her Amended Complaint and Demand for a Jury Trial ("Am. Compl."), asserting:  (1) hostile work environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) sex discrimination in violation of Title VII; (3) retaliation in violation of Title VII; (4) breach of contract; and (5) outrageous conduct.  Am. Compl. ¶¶ 106-49.

### The Parties and Witnesses

2.     **Plaintiff, Sharon R. Baker,** is a female and resident of Colorado.  Am. Compl.¶ 1; Am. Answer ¶ 1.

3.     **Defendant EchoStar Communications Corporation ("EchoStar Communications")** is a corporation incorporated in the State of Nevada with a principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado, 80112.  Am. Compl. ¶ 3; Am. Answer ¶ 3.

4.     **Defendants EchoSphere, L.L.C. ("EchoSphere") and EchoStar Satellite, L.L.C. ("EchoStar Satellite")** are limited liability companies formed under the laws of Colorado

with a principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado, 80112.  Am. Compl. ¶¶ 5, 8; Am. Answer ¶¶ 5, 8.

5.      **Soraya Hesabi-Cartwright** was the Executive Vice President of Dish Network at EchoStar, and from November 1998 through December 2003, supervised Plaintiff.  Deposition of Soraya Hesabi-Cartwright ("Cartwright Dep.") (Exhibit A hereto) at 58:9-12; 81:23-82:9.

6.      Mrs. Cartwright was generally responsible for EchoStar's human resources, customer service, programming, and marketing.  Cartwright Dep. 47:10-15; 60:3-10.

7.      **Michael Dugan** began working at a subsidiary of EchoStar Communications in 1990.  From the time Plaintiff was hired until Mr. Dugan retired in April 2004, he was President and Chief Operating Officer of EchoStar Communications.  Deposition of Michael Kelly ("Kelly Dep.") (Exhibit B hereto) at 67:15-17; April 6, 2004 Email from Sharon Baker to Mike Dugan ("4/6/04 Email") (Exhibit C hereto).

8.      During Plaintiff's employment, she never reported to Mr. Dugan.  Sharon Baker Deposition ("Baker Dep.") (Exhibit D hereto) at 98:8-10.

9.      **Michael Kelly** began working for EchoStar in 2000 as Senior Vice President of International Programming.  Kelly Dep. at 21:1-16.   At the time Plaintiff reported to him, Mr. Kelly was Executive Vice President of EchoStar Satellite.  Kelly Dep. at 21:10-16, 54:11-23.

10.      Mr. Kelly was Plaintiff's supervisor from January 2004, until she left in July 2004. January 4, 2005 Unemployment Hearing Transcript ("Unemployment Hearing Tr.") (Exhibit E hereto) at 8:7-8, 8:13-15, 8:22-23.

**Plaintiff's Employment as an Executive Assistant**

11.     On November 2, 1998, Plaintiff was hired as an Executive Assistant to Mrs. Cartwright.  Am. Compl. ¶ 29.

12.     Plaintiff understood that there was no express term to her employment, and that she was not guaranteed lifetime employment with EchoStar.  Baker Dep. at 200:2-4, 201:1-8, 202:7-9.

**A.     Company Guidelines Applicable to Plaintiff's Employment**

13.     After Plaintiff accepted employment with EchoStar, she received and read an employee handbook that was "Revised October 1997" ("Employee Handbook").  Baker Dep. at 201:17-202:22, 207:22-25; Employee Handbook (Exhibit F hereto).[2]

14.     Although Defendants revised the Employee Handbook several times after Plaintiff joined EchoStar, Plaintiff testified that she only received the 1997 version.  Plaintiff's Response to EchoSphere L.L.C.'s Request for Production of Documents (Exhibit G hereto) at Response No. 18; Baker Dep. at 208:4-14; Expert Report of Denise Kay (Exhibit H hereto) at p. 5.

15.     Plaintiff's breach of contract claim is based on the 1997 Employee Handbook.  Ex. G at Response No. 18; Baker Dep. at 208:4-14; Ex. H at p. 5.

16.     The very first page of the Employee Handbook states that it "is intended as an introduction to our Company's philosophy, guidelines and benefits. [. . .] The guidelines stated in this Handbook are subject to change at any time, with or without notice, at the sole discretion of the Company."  Ex. G at p. 1.

17.     The next page contains the following notice, in bold and capitalized print:

---

[2]  Defendants contend that this document is "confidential" pursuant to the parties' Stipulated Protective Order, and by filing discrete portions of the document not under seal, do not waive their "confidential" designation.

## IMPORTANT

[. . .] THE HANDBOOK IS NOT ALL INCLUSIVE, BUT IS INTENDED TO PROVIDE A SUMMARY OF SOME OF THE COMPANY'S GUIDELINES. [. . .] THE LANGUAGE USED IN THIS HANDBOOK DOES NOT CREATE OR CONSTITUTE A CONTRACT OF EMPLOYMENT WITH ANY EMPLOYEE, EITHER EXPRESS OR IMPLIED. [. . .] THE INFORMATION CONTAINED IN THIS HANDBOOK IS FOR GENERAL INFORMATION ONLY. [. . .] ALSO, THE NEED MAY ARISE TO CHANGE THE GUIDELINES DESCRIBED IN THE HANDBOOK.  THE COMPANY THEREFORE RESERVES THE RIGHT TO MAKE FINAL DECISIONS, INTERPRET AND APPLY THEM OR TO CHANGE OR DISCONTINUE THEM AT ANY POINT WITHOUT PRIOR NOTICE.

Ex. G at p. 2 (Emphasis in Original).

18.     One of the "Company's Guidelines" summarized in the Employee Handbook is titled "Equal Employment Opportunity," and provides that:

EchoStar . . . provides equal employment opportunities (EEO) to qualified employees and applicants . . . without regard to race, sex, age, national origin, disability or veteran status.  This applies to recruitment, hiring, compensation, promotion, training, layoff, transfer, leaves of absence and termination.
EchoStar does not condone discrimination or unfair treatment of any kind. It is the responsibility of each employee to report to a manager or to the Human Resources Department any discriminatory or unfair practices, regardless of whom they impact.

Ex. G at p. 6.

19.     Another one of the "Company's Guidelines" is titled "Protection from Unlawful Harassment," and it states:

It is the policy of EchoStar that all employees should be able to enjoy a work atmosphere free from all forms of illegal discrimination or conduct including sexual harassment. [. . .]   EchoStar does not tolerate or condone any form of retaliation or reprisal against an employee who has made a good faith complaint of harassment or discrimination.  All claims regarding these types of harassment will be treated confidentially to the extent that confidentiality is consistent with a thorough investigation of the reported incident. [. . .]

> [. . .] If an investigation confirms the offense, immediate disciplinary action up to and including termination may be taken against the person violating this policy.

Ex. G at p. 9.

20.     The Employee Handbook also contains a Guideline titled "Threats and Violence," which states:

> EchoStar seeks to maintain a work environment free from intimidation, threats or violent acts.   This includes, but is not limited to, intimidating, threatening or hostile behaviors, physical abuse, vandalism, arson, sabotage, use of weapons, carrying weapons of any kind onto Company property or any other act, which, in management's opinion, is inappropriate for the workplace.   In addition, offensive comments regarding violent events will not be tolerated and may result in disciplinary action.
> [. . . ] Based upon results, disciplinary action will be taken against the offender up to and including termination, if appropriate.

Ex. G at pp. 9-10.

21.     Plaintiff signed a receipt for the Employee Handbook, and the receipt states:  "I also understand this Handbook is for general information only, and represents brief summaries of Company guidelines which are subject to change or discontinuance at any time without prior notice. [. . .] Finally, I understand that nothing in this Handbook in any way creates an express or implied contract of employment between Company and me."  Acknowledgement of Receipt (Exhibit I hereto).

## B.     Plaintiff's Job Duties

22.     When Plaintiff reported to Mrs. Cartwright, her duties included scheduling meetings and appointments, arranging travel, keeping track of project priorities, attending meetings to take notes, getting reports, doing spreadsheets, keeping track of vendors, assisting the

call center administrative assistants, and planning company-wide functions.  Cartwright Dep. at 82:8-21, 83:6-84:8; Baker Dep. at 144:10-145:13.

23.     As Mrs. Cartwright's responsibilities increased over time, she relied more and more on Plaintiff.  Cartwright Dep. at 83:6-84:8.

### C.     The Job Duties of Other Executive Assistants

24.     Executive Assistants who supported executives other than Mrs. Cartwright did not have as many responsibilities as Plaintiff.  Cartwright Dep. at 85:24-86:13; Baker Dep. at 78:23-79:16; Deposition of Sheila Tomasek ("Tomasek Dep.") (Exhibit J hereto) at 75:5-12; Affidavit of Amberly Cavalier ("Cavalier Aff.") (Exhibit K hereto) at ¶ 3.

25.     For example, Shelia Tomasek was employed as an Executive Assistant to Messrs. Kelly and Dugan from September 2002 through October 2003, and then as the Executive Assistant to just Mr. Dugan from October 2003 until his retirement.  Tomasek Dep. at 10:15-18, 11:14-16, 15:19-21.

26.     As an Executive Assistant to Mr. Kelly, Ms. Tomasek's job duties were to manage his calendar, handle meeting requests, answer phones, take phone messages, handle people coming and going from Mr. Kelly's office, file, and create folders.  Tomasek Dep. at 13:11-23, 37:15-38:3.

27.     As an Executive Assistant to Mike Dugan, Ms. Tomasek's duties were to manage his calendar, handle meeting requests, answer phones and file.  Tomasek Dep. at 13:24-14:3, 17:15-22.

28.     Executive Assistant Rita Bartolo, who supported executive and General Counsel David Moskowitz, answered telephones and typed e-mails.  Unemployment Hearing Tr. at 93:16-21, 95:8-12.

### D.     The Executive Suite

29.     Employees of EchoStar sometimes used profanity at work.  Kelly Dep. at 68:2-22; Deposition of Suzanne Beall ("Beall Dep.") (Exhibit L hereto) at 95:2-96:8; Deposition of John Scarborough ("Scarborough Dep.") (Exhibit M hereto) at 87:15-20; Tomasek Dep. at 31:14-19; Deposition of David Moskowitz ("Moskowitz Dep.") (Exhibit N hereto) at 32:17-33:4, 66:1-67:2; Cartwright Dep. at 154:4-6; 157:5-19; Baker Dep. at 30:24-31:7; 93:7-8.

30.     And between January and July 2004 executives (male and female) sometimes used profanity in a work area known as the executive suite.  Kelly Dep. at 68:2-22; Beall Dep. at 95:2-96:8; Scarborough Dep. at 87:15-20; Tomasek Dep. at 31:14-19; Moskowitz Dep. at 32:17-33:4, 66:1-67:2; Cartwright Dep. at 154:4-6; 157:5-19; Baker Dep. at 30:24-31:7; 93:7-8.

31.     Executives also sometimes yelled, or raised their voices.  Beall Dep. at 87:6-88:22, 93:7-95:1; Kelly Dep. at 69:20-23; Scarborough Dep. at 91:9-25; Cartwright Dep. 181:4-182:10.

32.     The profanity and yelling were used in the presence of both male and female employees.  Beall Dep. at 94:8-23; Baker Dep. at 85:20-86:5, 92:3-16.

33.     Although Plaintiff does not complain about the profanity used by her friend and former supervisor Mrs. Cartwright, it is undisputed that Mrs. Cartwright used profanity at EchoStar, including the words "damn" "shit" "fuck" "goddamn" and "Jesus Christ."  Cartwright Dep. at 157:17-159:20; Cavalier Aff. ¶¶ 9-10.

34.     Plaintiff herself has used "every word in the book," including "shit," "damn," and "fuck."  Deposition of Scott Baker ("Scott Baker Dep.") (Exhibit O hereto) at 124:17-126:11.

35.     Plaintiff has admitted that she used the words "shit" and "fuck" while she worked at EchoStar.  Baker Dep. at 182:13-18.

36.     A former employee describes Plaintiff as a "potty mouth" and recalls hearing Plaintiff use the words "fuck" and "Goddamnit" at EchoStar.  Cavalier Aff. at ¶ 8.

**E.     Plaintiff's Work Environment Prior to 2004**

    **(i)     2002**

37.     Plaintiff overheard Mr. Dugan talk about being able to see up a lady's dress as she climbed the stairs at the Riverfront facility.  Am. Compl. ¶ 51; Baker Dep. 21:3-15.  Plaintiff thought the comment was "embarrassing."  Baker Dep. 22:25-23:22.

    **(ii)     2003**

38.     When Kim Cattrall, a star from "Sex and the City," visited EchoStar, Mr. Dugan commented that he felt like he almost had an orgasm when he was in the room with her.  Baker Dep. 60:6-13.

39.     At a college recruitment meeting Plaintiff heard Mr. Dugan mention that he would like to see EchoStar hire "young pretty women with nice little bodies."  Baker Dep. 25:14-22.

40.     Plaintiff testified that when Mr. Dugan hugged her, she thought he was trying feel her breasts.  Baker Dep. at 100:19-101:11.

### F.      Plaintiff's Work Environment in 2004

#### (i)      January 2004

41.      Mrs. Cartwright's last day working for EchoStar Satellite was December 20, 2003. Cartwright Dep. at 232:8-10.

42.      Mr. Kelly assumed some of Mrs. Cartwright's duties and Plaintiff was assigned to support Mr. Kelly.  Kelly Dep. at 63:13-64:2; Beall Dep. at 132:19-133:13.

43.      Immediately after she began reporting to Mr. Kelly, Plaintiff realized that she would not have the same job duties she had performed under Mrs. Cartwright.  Baker Dep. Ex. 3[3] (Exhibit P hereto); April 27, 2005 Affidavit of Sharon R. Baker ("4/27/05 Baker Aff.") (Exhibit Q hereto) at ¶ 2.

44.      While reporting to Mr. Kelly, Plaintiff's job duties included setting his calendar, working with the travel department on travel arrangements, answering phones, preparing reports, filing, arranging meetings, dealing with customer complaints, picking up his lunch, and locating forms for foreign travel.  Baker Dep. at 145:19-146:21; Tomasek Dep. at 63:18-65:16; Kelly Dep. at 78:11-79:17.

45.      Plaintiff did not experience a change in her job title or salary under Mr. Kelly's supervision; in fact, she received a raise.  Unemployment Hearing Tr. at 11:5-17; Baker Dep. at 161:2-17.

---

[3] Defendants object to Plaintiff's amendments to her deposition testimony because they significantly alter her original testimony and are nothing more than an attempt to alter damaging statements. *See Garcia v. Pueblo Country Club*, 299 F.3d 1233 (10th Cir. 2002).  Because all facts are to be viewed in the light most favorable to the non-moving party on summary judgment, however, Defendants treat these amendments as true only for this Motion.

46.     According to Plaintiff, in January 2004, Mr. Dugan made a remark about his trip to the Playboy Mansion for a New Year's Eve party.  Baker Dep. at 111:2-4; 112:11; 112:20; Baker Dep. Ex. 3.

### (ii)     March 2004

47.     Plaintiff testified at her deposition that Mr. Kelly called her a "fucking stupid bitch" in March 2004, because she sent out a particular email (despite Plaintiff's prior statements under oath that Mr. Kelly told her she was "fucking stupid").  *Cf.* Baker Dep. at 36:13-14, 37:2-38:2; Baker Dep. Ex. 3, *with* August 24, 2004 Appeal of Unemployment Decision (Exhibit R hereto) at ¶¶ 1, 3, Unemployment Hearing Tr. at 13:22-26; March 14, 2005 Affidavit of Sharon R. Baker ("3/14/05 Baker Aff.") (Exhibit S hereto) at ¶ 25; 4/27/05 Baker Aff. at ¶ 3; Complaint and Demand for a Jury Trial ¶ 35; and Am. Compl. ¶ 47.

48.     Plaintiff alleges that she complained to Mr. Scarborough, EchoStar's Senior Vice President of Human Resources, about this comment (whatever it was) and mentioned she would like to find another position at EchoStar.  Baker Dep. 59:3-11; Baker Dep. Ex. 3.

49.     According to Plaintiff, after her conversation with Mr. Scarborough, Mr. Kelly approached Plaintiff and said:  "Well I understand I pissed little Sharon off today.  I guess I shouldn't have pissed little Sharon off.  I didn't mean to make little Sharon mad."  Baker Dep. 59:14-16; Am. Compl. ¶ 61.

### (iii)     April 2004

50.     In early April 2004, Mr. Dugan announced that he would be retiring.  4/6/04 Email. Plaintiff and Mr. Dugan exchanged several emails on the subject, and in each email Plaintiff expressed to Mr. Dugan that she valued his friendship and would miss him when he was gone.

*See id.*; April 23, 2004 email from Sharon Baker to Mike Dugan (Exhibit T hereto); April 29, 2004 email from Sharon Baker to Mike Dugan (Exhibit U hereto).

51.     Plaintiff testified that she and Mr. Dugan "had a good business relationship" and sometimes kidded around.  Baker Dep. at 112:4-8.

52.     During this time period, Plaintiff says that she overheard Mr. Dugan make a comment to Shelia Tomasek about her "big boobs" and how her "butt look[ed] big in [her] pants."  Baker Dep. 60:15-16; 104:2-105:11; Baker Dep. Ex. 3.

53.     Mr. Dugan retired from EchoStar at the end of April 2004.  4/6/06 Email.

54.     According to Plaintiff, in April 2004, she overheard Mr. Kelly make a comment about Ms. Tomasek's "boobs coming out of her shirt."  Baker Dep. 72:13-18, 72:24-73:4; Baker Dep. Ex. 3.

55.     Also, during an executive meeting (which did not include Plaintiff) Robert Kondalis, former Vice President of Project Operations, made the comment to Suzanne Beall, former Vice President of Customer Management Operations, "how do you like your dick? on a hoagie or a bun?"  Beall Dep. at 35:6-38:21; Baker Dep. at 61:5-6.

56.     The comment was not directed at Plaintiff and it was not about Plaintiff.  Kelly Dep. at 82:14-83:12; Beall Dep. at 35:2-24; 36:14-38:21.

**(iv)     May 2004**

57.     In May 2004, Plaintiff walked into a meeting and overheard Mr. Kelly telling a joke that involved the "hiking up" of a skirt and three stewardesses.  Plaintiff missed the punch line, however, because she had set down the papers she brought into the meeting and left.  Baker Dep. at 113:2-114:19; 117:14-24; Unemployment Hearing Tr. at p. 12:9-13.

### (v)   June 2004

58.     According to Plaintiff, in June, 2004, she spilled a Pepsi in Mr. Kelly's office and he responded angrily, yelling and calling her a "stupid idiot."  Baker Dep. at 64:8-24; Baker Dep. Ex. 3.

59.     On June 26, 2004, Mr. Kelly left the office for a family vacation in Africa.  He was out of the office through July 14, 2004.  Kelly Dep. at 115:2-6; May 28, 2004 email from Sharon Baker re Michael Kelly out of office (Exhibit V hereto).

60.     Before Mr. Kelly left, Plaintiff emailed him "Good Luck and have a great time on your trip.  Rest, relax and enjoy your family! [. . .] See Ya."  June 25, 2004 email from Sharon Baker to Michael Kelly (Exhibit W hereto).

61.     In her very last communication with Mr. Kelly, Plaintiff wrote "Thanks – have a wonderful time – I will get this done ASAP – All is Well – ."  June 29, 2004 Email from Sharon Baker to Michael Kelly (emphasis added) (Exhibit X hereto).

### (vi)   July 2004

62.     On July 7, 2004, Plaintiff signed a letter of resignation addressed to Mr. Kelly. Letter of Resignation (Exhibit Y hereto).

63.     Plaintiff gave the letter to Mr. Scarborough and put a copy in Mr. Kelly's inbox. Baker Dep. at 241:2-22, 242:13-18.

64.     There is no mention of sexual harassment, a hostile work environment, excessive use of profanity, yelling, discrimination, retaliation, breach of contract, or outrageous conduct in the letter of resignation.  *See* Ex. Y.

65.     Plaintiff was scheduled to take vacation the last week of her resignation period (July 15 through July 21, 2004), so Plaintiff planned – as of the date she gave notice – that her last day on the job would be July 14, 2004.  Baker Dep. 251:19-252:3; Am. Compl. ¶ 71; Unemployment Hearing Tr. at 25:25-26:2.

66.     Part of this vacation was to be spent at Mr. Dugan's ranch; Plaintiff was excited about the vacation and wrote to Mr. Dugan "I can't wait to go there. :-)"  April 14, 2004 e-mail from Sharon Baker to Mike Dugan (Exhibit Z hereto).

67.     Plaintiff and her family subsequently decided not to vacation at Mr. Dugan's ranch during the final week in July, 2004, because her mother became ill.  Scott Baker Dep. at 81:4-82:1.

### (vii)     July 13 and 14, 2004 – Plaintiff's Last Two Days At Work

68.     During 2004, Attorneys David Noll and Wade Welch of T. Wade Welch & Associates were interviewing potential witnesses at EchoStar regarding claims Mrs. Cartwright alleged against the Company.  Deposition of David Noll ("Noll Dep.") (Exhibit AA hereto) at 14:19-25; Deposition of Wade Welch ("Welch Dep.") (Exhibit BB hereto) at 14:3-9.

69.     On July 13, 2004, Mr. Noll telephoned Plaintiff for an interview.  Noll Dep. at 48:9-17; Baker Dep. at 222:6-15.

70.     Mr. Noll asked Plaintiff questions, which Plaintiff "answered."  Upon hearing each response, Mr. Noll asked "would you say this is a correct statement?"  Baker Dep. at 222:6-15.  According to Plaintiff, Mr. Noll had difficulty repeating her statements back correctly, and he restated her answers in a manner favorable for the Company.  Appeal of Unemployment Decision

at ¶ 6; Unemployment Hearing Tr. at 22:22-28, 23:18-24:9; Baker Dep. at 215:17-216:12, 222:6-15.

71.    Plaintiff claims she then told Mr. Noll that she would like to retain her own legal counsel.  Appeal of Unemployment Decision at ¶ 6; Unemployment Hearing Tr. at 20:23-21:16; Baker Dep. at 217:7-18.

72.    She told Mr. Noll she would contact him on Wednesday, July 14, 2004, and complete her interview with counsel present.  Appeal of Unemployment Decision at ¶ 6; Unemployment Hearing Tr. at 25:7-10.

73.    Mr. Noll did not scream or even raise his voice during this phone conversation. Baker Dep. at 223:8-10.

74.    On Wednesday, July 14, 2004, Mr. Welch was at EchoStar on other business and stopped by Plaintiff's desk.  Welch Dep. 31:9-21.  He asked her to finish the interview with Mr. Noll that day because Plaintiff was going to be on vacation starting the next day.  Appeal of Unemployment Decision at ¶ 7; Baker Dep. at 225:7-226:2; Welch Dep. 45:12-46:1.  (Mr. Welch did not know that Plaintiff had told Mr. Noll she wanted to retain her own attorney before continuing the conversation.  Welch Dep. at 35:18-24.)

75.    Mr. Welch told Plaintiff to speak with Mr. Noll by telephone so that Mr. Noll could fax her an affidavit.  Appeal of Unemployment Decision at ¶ 7; Baker Dep. at 226:16-21.

76.    Mr. Welch hit Plaintiff's fax machine three or four times and said "We can get it right here.  You just need to sign it and you can walk out the door freely" meaning that he wouldn't have to bother Plaintiff after she left EchoStar.  Unemployment Hearing Tr. at 26:25-29, 27:1-5; Baker Dep. at 226:14-21, 235:5-7.

77.     Plaintiff alleges that Mr. Welch told her nothing she had seen or heard at EchoStar could be considered illegal gender discrimination or sexual harassment, that Mrs. Cartwright's charges had no validity, and Plaintiff should state so in her affidavit.  Am. Compl. ¶ 86; Baker Dep. at 179:21-180:7, 226:7-19; Appeal of Unemployment Decision ¶ 7.

78.     Mr. Welch told Plaintiff he would meet her back at her desk at 3:00 p.m.  Baker Dep. 227:11.

79.     Plaintiff agreed to speak to Mr. Noll at 3:00 p.m. on July 14th; however, she never called him and when Mr. Noll attempted to reach Plaintiff she did not answer her phone.  Appeal of Unemployment Decision at ¶ 7; Unemployment Hearing Tr. at 27:29-28:2; Baker Dep. at 222:16-20.

80.     Plaintiff acknowledges that prior to July 13th, she had no problems with Mr. Noll or Mr. Welch.  Baker Dep. at 204:20-23; 205:10-13.

81.     Notably, at the time of their conversations with Plaintiff, neither Mr. Noll nor Mr. Welch knew that Plaintiff had complained to anyone at EchoStar about her work environment, sexual harassment or discrimination.  Baker Dep. at 233:3-18.

82.     On her way out of the building, Plaintiff ran into Mr. Scarborough but she did not tell Mr. Scarborough why she was leaving and never gave anyone at EchoStar the opportunity to investigate her charges that she was treated inappropriately by attorneys Welch and Noll.  Scarborough Dep. at 81:15-22, 117:23-118:14.

83.     Plaintiff left without giving Mr. Scarborough an opportunity to discuss with her a transfer to another position.  Scarborough Dep. at 116:7-117:3.

84.     Mr. Scarborough left Plaintiff a voicemail message on July 14, 2004, after she left EchoStar.  Baker Dep. at 52:22-53:13; 54:21-3.  She did not return his phone call.  *Id*.

### (viii)   After Plaintiff Left EchoStar

85.     On Friday, July 16, 2004, Mr. Scarborough called Plaintiff again.  Baker Dep. at 55:7-56:7.

86.     She did not give him the opportunity to discuss another position for her at EchoStar.  Baker Dep. at 55:7-56:7.

## ARGUMENT

## I.     STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2003); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## II.     PLAINTIFF WAS NOT SUBJECTED TO A HOSTILE WORK ENVIRONMENT.

A.     The Elements of Her Claim:

To sustain her claim for hostile work environment sexual harassment, Plaintiff must show that: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) due to its severity or pervasiveness, the harassment altered a term, condition, or privilege of Plaintiff's employment and created an abusive working environment.  *See Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 797 (10th Cir. 1997), *overruled on other grounds, Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

B.    <u>The Elements Plaintiff Cannot Show</u>:

Plaintiff cannot demonstrate either the third or fourth prong of her *prima facie* case because the alleged harassment was not based on gender, and it was neither severe nor pervasive.

1.    The "Harassment"[4] Was Not Based On Plaintiff's Gender.

"Title VII is not a code of workplace conduct."  *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005).  It does not "guarantee a utopian workplace, or even a pleasant one." *Trujillo v. University of Colo. Health Science Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (quotations omitted).  And it was not "designed to bring about a magical transformation in the social mores of American workers."  *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1538 (10th Cir. 1995).  Thus, a hostile work environment claim "requires a showing not only of severe and pervasive harassment, but of severe and pervasive harassment *based on gender*."  *Chavez*, 397 F.3d at 833 (emphasis added).  If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment.  *See Stahl v. Sun Microsystems*, 19 F.3d 533, 538 (10th Cir. 1994).

a.    General harassment is not prohibited by law.

"The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Riske v. King Soopers*, 366 F.3d 1085, 1091 (10th Cir. 2004) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (internal quotes omitted)).   For example, in *Bolden v. PRC, Inc.*, the plaintiff was subjected to a work environment that included

---

[4]  Defendants, and Messrs. Kelly and Dugan, adamantly dispute Plaintiff's allegations, including the telling of sexual jokes and use of profanity directed towards Plaintiff.  For purposes of this Motion only, these allegations are treated as undisputed.

the following occurrences: a co-worker warned the plaintiff to be careful "because we know people in [the] Ku Klux Klan; the words "honky" and "nigger" were used in the plaintiff's presence; a co-worker drew a sad face cartoon with the title "Junior makes the same pay as I do"; the co-worker was called a "dickhead," "dumbshit," "asshole," "faggot," and "fool"; his chair was rigged so the back would fall off; and he was violently pushed. 43 F.3d 545, 549 (10th Cir. 1994). The plaintiff testified that the work environment had a "joking" atmosphere, and many of the workers harassed one another and were the recipient of jokes. *Id*. at 551. The Tenth Circuit found that "[t]he derisive environment in the workshop was universal" and the plaintiff's claim for hostile work environment racial harassment failed because "he [had] not shown he was singled out for abuse and has not shown the ridicule he faced stemmed from racial animus." *Id.*

Similarly, in *Penry v. Federal Home Loan Bank of Topeka*, the Tenth Circuit found numerous instances of alleged "harassment" insufficiently motivated by gender to be sexual harassment. 155 F.3d 1257, 1263 (10th Cir. 1998). There were two plaintiffs in *Penry*. One was subjected to "four specific acts of unwanted physical contact" that were due to her gender, other periodic touching, and a comment that one of the female assistants "allowed [a male co-worker] to get in her drawers anytime." *Id.* at 1260-61. This plaintiff was also taken by a co-worker to dine at Hooters. *Id.* at 1260. The other plaintiff was subjected to four gender-related comments (being asked if women have wet dreams, being told that he liked her bra strap showing, being asked "what she was wearing under her dress," and hearing the above "in her drawers" comment). *Id.* at 1262. In addition, a co-worker commented to both plaintiffs about "the roof of a particular mall [being] shaped like a woman's breasts." *Id.* at 1260. The court found the work environment was "unpleasant," but the action the plaintiffs complained about

were "motivated by poor taste and a lack of professionalism," not plaintiffs' gender.  *Id.* at 1263.

           b.        General use of profanity is not prohibited by law.

Furthermore, the general use of profanity, without evidence that it is based on gender, is not sufficient to support a claim for sexual harassment.  In *Reyes v. McDonald Pontiac GMC Truck, Inc.*, the court dismissed the claim of hostile work environment stating:

> Name calling and loud arguments do not constitute a sexual harassment claim. The fact that [plaintiff's co-worker]  referred to plaintiff on two occasions as a "bitch" or "Miss F****** Queen Bee" does not show that she was discriminated against because of her sex.  Was [he] rude?  Yes.  Were [his] comments inappropriate in an employment setting?  Yes.  But that is all they were. Sometimes words of frustration and anger are only meant in that spirit.

997 F. Supp. 614, 616 (D. N.J. 1998).  *See also Gross*, 53 F.3d at 1543 (term "ass" is a vulgar expression that refers to a portion of the anatomy of both sexes and is gender-neutral; the term "dumb" is gender-neutral); *Luttjohann v. Goodyear Tire & Rubber Co.*, 927 F. Supp. 403 (D. Kan. 1996) (use of term "fucking" as an adjective – "god dam fucking notes, god dam fucking liar" – is gender-neutral); *Kriss v. Sprint Commc'ns Co.*, 58 F.3d 1276, 1281 (8th Cir. 1995) ("[T]he word 'bitch,' . . . is not an indication of a general misogynist attitude.  Rather, it is a crude, gender-specific vulgarity, which in this case was directed toward only one woman, rather than women in general.").

           c.        Any "harassment" at EchoStar was general, not gender-based.

Executives at EchoStar, and their assistants, work in a high-pressure, demanding work environment.  With these pressures sometimes comes the use of profanity.  Statement of Fact ¶ 29.  Profanity is used by both genders, however, and in the presence of both men and women. Statement of Fact ¶¶ 30, 32.  Male and female members of the executive team also yell on occasion.  Statement of Fact ¶ 31.  But again, such behavior occurs by and around both genders.

Statement of Fact ¶ 32.   Thus, as Plaintiff acknowledged, if it was "hostile" for her, it was "hostile" for everyone:

> Q:   Why did you use the phrase, "All the assistants in the executive suite," and not all of the individuals or people in the executive suite?
> A:   Because the reason I did that was because the language and actions, and yelling and screaming, and doors slamming, came from Mr. Ergen, Mr. Dugan, Mr. Kelly, Mr. Moskowitz.  I suppose at times, if Mr. Ergen was in the hallway yelling at them, **it was hostile for them, too**.
> Q:   That's really the nature of my question. If Mr. Kelly or Mr. Moskowitz is listening to Mr. Ergen yell or scream, wouldn't you think that they are also experiencing a hostile work environment from Mr. Ergen?
> A:   And contributing to it, yes, **I would say they are experiencing it** and contributing to it when they would yell back in the same tone, or even higher in the same language.
> Q:   So you're not denying, then, that males as well as females experienced the environment in the executive suite that you're complaining about?
> A:   It was a hostile environment in the executive suite, yes.
> * * *
> The Deponent:  I'm saying that it was a hostile environment up there.  **Everybody that worked up there, male, female, experienced hostility, and loud profanity, doors slamming.**

Baker Dep. at 90:25-92:6 (emphasis added).

While this may be a difficult environment, that does not mean yelling or profanity is underlined. Numerous courts, including this Court, have repeatedly reminded us that Title VII is not "a code of workplace conduct."  *See Chavez*, 397 F.3d at 833; *Mark White v. Home Depot U.S.A., Inc.* (Civil Action No. 05-cv-00683) (August 3, 2006 Order on Defendant's Motion for Summary Judgment); *Cindy Crowle v. Gale Norton* (Civil Action No. 04-cv-00982) (October 31, 2005 Order on Defendant's Motion for Summary Judgment).

Further, it is hypocritical for Plaintiff to argue that she found the use of profanity to be offensive, when she used profanity at work.  *See, e.g.*, *Gross*, 53 F.3d at 1538 (10th Cir. 1995) (holding that plaintiff female truck driver did not suffer from a hostile work environment, where

she used the same profane and obscene language as her male co-workers).  Here, Plaintiff admits that she used profanity at work, including the terms "shit" and "fuck."  Statement of Fact ¶ 35.  A former employee describes Plaintiff as a "potty mouth" and heard Plaintiff say "Goddamnit" and "fuck" while at work.  Statement of Fact ¶ 36.  Plaintiff's husband testified that she used "every word in the book."  Statement of Fact ¶ 34.  And the day Plaintiff walked off the job, she called her husband as she left, and the first words out of her mouth were "I can't find my <u>fucking</u> car."  Scott Baker Dep. at 67:5-9 (emphasis added).

Because Plaintiff cannot show that the yelling and profanity in the executive suite (including her use of profanity) were based on gender, the fact that they may have been part of her work environment does not support her claim of hostile work environment sexual harassment.  *See Penry*, 155 F.3d at 1261 (holding that there was no gender-motivated discrimination because it was no more likely that the comments would be addressed to the plaintiff than anyone else in the organization); *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1176 (10th Cir. 1996) (noting that plaintiff's reliance on testimony by former employee that plaintiff's supervisor made offensive racial and sexual remarks only showed that the restaurant "was a highly volatile and frequently unpleasant place to work for both men and women," not a hostile work environment).

    2.    Conduct Prior to 2004 Is Not Before The Court; It Is Time-Barred.

The timely filing of a discrimination charge is a prerequisite to a civil suit under Title VII.  *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974).  Such charge must be filed within 300 days after the alleged unlawful conduct occurs.  42 U.S.C. § 2000e-5(e).

Plaintiff filed her EEOC Charge on April 27, 2005.  *See* EEOC Charge (Exhibit CC). Any events in 2002 or 2003 are outside the 300 day time-period and, therefore, cannot form the basis of her Charge.  Any allegations of harassment that occurred prior to 2004 are time-barred. They include the following:  (1) a 2002 comment by Mr. Dugan about being able to see up a woman's skirt as she used the stairs; (2) a 2003 comment by Mr. Dugan about actress Kim Cattrall; (3) a 2003 comment by Mr. Dugan about hiring women with nice bodies; and (4) hugs given to Plaintiff by Mr. Dugan in 2003 or earlier.

Moreover, Plaintiff has repeatedly stated that she was subjected to a hostile work environment only <u>after</u> she was assigned to support Mr. Kelly in the Executive Suite <u>in January 2004</u>.  *See* 4/27/05 Baker Affidavit at ¶ 2 ("During the time I was directly supervised by Mr. Kelly, he and other Echostar [sic] employees subjected me to a hostile and harassing environment"); Unemployment Hearing Tr. at 9:14-18, 11:18-12:23; Am. Compl. ¶ 39.  Thus, events from 2002 and 2003 cannot provide a basis for Plaintiff's sexual harassment claim.  *See Haug v. City of Topeka, Equip. Mgmt. Div.*, 13 F. Supp. 2d 1153, 1158-59 (D. Kan. 1998).

3.      The "Harassment" Was Neither Severe Nor Pervasive.

Whether the conduct complained of rises to the level sufficient to create a hostile work environment is a legal question that a court may address on summary judgment.  *See Mackenzie v. City and County of Denver*, 414 F.3d 1266, 1280-81 (10th Cir. 2005).  Factors to be considered include: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating; and (4) whether it unreasonably interfered with plaintiff's job performance.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998);

*McPherson v. HCA-HealthONE, LLC*, 202 F. Supp. 2d 1156, 1171 (D. Colo. 2002).   The environment must be both subjectively and objectively hostile.  *MacKenzie*, 414 F.3d at 1280.

Even if the Court were to accept Plaintiff's allegations as true, these instances of harassment are not severe or pervasive.  They include:  (1) a January 2004 story by Mr. Dugan about celebrating New Year's Eve with his wife at the Playboy mansion; (2) a March 2004 incident when Mr. Kelly called Plaintiff a "fucking stupid bitch"; (3) an April 2004 joke by Mr. Kondalis to Mrs. Beall; (4) an April 2004 comment by Mr. Dugan to Ms. Tomasek regarding her "big boobs" and "big butt"; (5) an April 2004 comment by Mr. Kelly to a third party regarding Ms. Tomasek's breasts; and (6) an May 2004 joke about stewardesses by Mr. Kelly to another party.

a.       A handful of instances is too infrequent to be "pervasive."

Isolated incidents of harassment, even if they are inappropriate and boorish, do not constitute pervasive conduct.  *Bolden*, 43 F.3d at 551.  In order to show pervasiveness, there must be a steady barrage of opprobrious comments, rather than sporadic insults.  *Id*.

Six instances of "harassment" – several of which were comments overheard by Plaintiff, not comments directed at her –is not pervasive.  *See Ford v. West*, 222 F.3d 767, 777-78 (10th Cir. 2000) (multiple racial slurs was insufficient to constitute pervasive conduct); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (five incidents over sixteen months not sufficient); *Olivarez v. Centura Health Corp.*, 203 F. Supp. 2d 1218, 1224 (D. Colo. 2002) (multiple instances of racial discrimination not pervasive enough).

b.      The harassment was not severe.

Workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80. A mere offensive utterance is not sufficient to state a claim for sexual harassment. *Faragher*, 524 U.S. at 787-88. Of the alleged instances of harassment, none of them were objectively severe, and if they were, they were not directed at Plaintiff.

i.      Mr. Dugan's comments

Plaintiff states that she was "uncomfortable" but not necessarily offended when Mr. Dugan told Plaintiff about visiting the Playboy mansion with his wife. Baker Dep. at 112:17-24. Despite testifying that she "didn't think it was anything he really needed to share with me" (Baker Dep. at 112:12-13), her email to him, stating "I hope you had a wonderful New Years – and I hope your eyes are not strained too bad from New Years Eve," suggests that she was not offended by this trip and that she, in fact, engaged in playful banter with Mr. Dugan about the experience. Jan. 2, 2004 Email from Sharon Baker to Michael Dugan (Exhibit DD hereto).

In *MacKenzie*, the Tenth Circuit confirmed that the plaintiff's supervisor had made age-related comments that might raise an issue of fact for a jury on the plaintiff's claim of hostile work environment under the ADEA. 414 F.3d at 1281. The record also demonstrated, however, that the plaintiff was willing to make age-related comments of her own toward her supervisor. *Id*. Faced with the comments from both the plaintiff and her supervisor, the Tenth Circuit concluded, "[g]iven the kind of mutual bantering that took place here, we cannot conclude the workplace could be considered either objectively or subjectively hostile." *Id*. Here, Plaintiff and Mr. Dugan engaged in friendly banter about the trip. Statement of Fact ¶ 51; Ex. DD.

This banter would also be consistent with the fact that Plaintiff is a big "Sex and the City" fan, a show notorious for its sexual themes – including scenes at the Playboy mansion.  *See* Scott Baker Dep. at 158:8-22.  Plaintiff watches the show with her youngest daughter and Plaintiff has never been offended by it.  Scott Baker Dep. at 158:8-22, 159:5-8.

Plaintiff also testified that she was offended by a comment Mr. Dugan made to his Executive Assistant, Shelia Tomasek about her "big boobs" and her "butt look[ing] big in [her] pants."  Statement of Fact ¶ 52.  Although Ms. Tomasek does not recall the incident, Plaintiff testified that Ms. Tomasek was not offended.  Baker Dep. at 106:24-107:13; Tomasek Dep. at 41:10-11.  Further, Plaintiff was not truly offended by Mr. Dugan's comments, according to her own emails to him.  *See* Exhibits C, T, U.  By her own admission, they "had a good business relationship" and kidded around.  Statement of Fact ¶ 51.  Also, around the time of Mr. Dugan's retirement, Plaintiff shared with Mr. Dugan how much she would miss him and how much she appreciated his friendship.  Exhibit T.  She calls him a "Silly ol' Bear!" and wishes him "much happiness."  Exhibit U.

Thus, Plaintiff did not cut off social contact with Mr. Dugan after he engaged in behaviors that supposedly contributed to her "hostile work environment."  *Cf. Walker v. AMR Services Corporation*, 971 F. Supp. 110 (E.D.N.Y. 1997) (plaintiff discontinued the rides home with alleged harasser immediately after he lunged at her and said "I want to be all over you."). In fact, Plaintiff was quite willing to take advantage of Mr. Dugan's generosity and stay at his ranch the same week she left EchoStar due to the "hostile work environment."  Statement of Fact ¶ 66.   The only reason the visit did not take place was because Plaintiff's mother fell ill. Statement of Fact ¶ 67.

ii.   *Mr. Kelly's comments*

In March 2004, Mr. Kelly allegedly called Plaintiff a "fucking stupid bitch" for sending an email of which he disapproved.  *See* Statement of Fact ¶ 47.  This incident, even if it occurred, does not establish a *prima facie* case of hostile work environment.   Under Supreme Court precedent, use of the word "bitch" on one occasion does not constitute "severe or pervasive" harassment.  *See*, *e.g.*, *Gross*, 53 F.3d at 1542-43 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) ("a single statement which engenders offensive feelings in an employee would not affect the conditions of employment to a sufficiently significant degree to violate Title VII"); *Ford*, 222 F.3d at 777-78.

Moreover, there is nothing about this comment to suggest it was based on Plaintiff's gender.  EchoStar had a goal to achieve 10 million subscribers before June 30, 2004.  Kelly Dep. at 118:13-119:21.  "[I]t was a very tight goal, so it wasn't as if it was a foregone conclusion."  *Id.* Mr. Kelly wanted everyone to stay focused on the goal and not assume they would achieve it. *Id*.  Because Plaintiff's email was not consistent with this message, Mr. Kelly disliked the email. *Id.*  There is nothing to suggest this comment was made because of Plaintiff's gender; it was in response to an error in Plaintiff's judgment.

Plaintiff further argues that a joke by Mr. Kelly about three stewardesses contributed to the hostile work environment.  Statement of Fact ¶ 57.  Plaintiff acknowledged, however, that she only overheard part of the joke (when she interrupted Mr. Kelly talking to someone else), and she walked away before she heard the punch-line.  *Id*.  So, although Plaintiff believes Mr. Kelly told a sexual joke, she does not actually know whether it was a joke or sexual.  *Id.*

Finally, Plaintiff asserts that a comment made by Mr. Kelly about Ms. Tomasek's "boobs coming out of her shirt" contributed to a hostile work environment.  *See* Statement of Fact ¶ 54. According to Plaintiff's own testimony, however, Mr. Kelly made the comment to someone other than Ms. Tomasek, and Plaintiff was not part of the conversation.  Baker Dep. at 72:13-73:10; 73:18-74:10.

These three isolated incidents are not objectively severe as a matter of law to constitute a hostile work environment.  *See McPherson*, 202 F. Supp. 2d at 1172-74, and cases cited therein.

### iii.    *Mr. Kondalis' comment to Suzanne Beall*

In January 2004, following a sensational trial, a German man was convicted of cannibalizing another man.  *See* Hannah Cleaver, *Cannibal Gets Eight Years For Manslaughter*, The Daily Telegraph (London), Jan. 31, 2004, at p. 7 (Exhibit EE hereto).  At a meeting among Mr. Kelly, Mrs. Beall Mr. Kondalis and executive Germar Schaeffer, Mr. Schaeffer relayed this story.  Beall Dep. at 37:16-38:2.  After hearing the story, Mr. Kondalis turned to Mrs. Beall and said, "how do you like your dick? on a hoagie or a bun?"  Statement of Fact ¶ 55; Beall Dep. at 38:12-21.  Mrs. Beall shook her head, looked down at the table, and shrugged the comment off. Beall Dep. at 39:10-19.  The topic of conversation then returned to business; however, Mr. Kelly reprimanded Mr. Kondalis immediately after the meeting.  Beall Dep. at 40:9-12; Kelly Dep. at 84:21-85:9.  Plaintiff was not in the room during the meeting.  Baker Dep. at 130:15-20.  Later, Mrs. Beall told Plaintiff what Mr. Kondalis had said.  Beall Dep. at 57:13-25.

This comment is not severe enough to state a cause of action.  *See DeAngeles v. El Paso Municipal Police Officers Ass'n*, 51 F.3d 591 (5th Cir. 1995) (crude language, tasteless joke insufficient).  Plaintiff was not the subject of the joke and the joke was not directed at her; in

fact, it was a stray comment that was not even intended for Plaintiff to hear.  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994); Baker Dep. at 130:15-20 Thus, Mr. Kondalis' comment was not sufficiently severe to establish a *prima facie* case for hostile work environment.

    4.  The Harassment Did Not Interfere With Plaintiff's Job Performance.

  Finally, Title VII's prohibition on sexual harassment only forbids behavior so objectively offensive as to alter the terms of the victim's employment.  The Supreme Court directs that it has "always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the work place . . . for discriminatory 'conditions of employment.'"  *Oncale*, 523 U.S. at 81.

  According to Plaintiff, the alleged incidents of harassment <u>never once</u> interfered with her job performance.  Plaintiff testified that she was still able to perform her job duties during all of 2004.  Baker Dep. at 129:12-130:14.  In fact, Plaintiff says that she not only continued to perform her job duties, she excelled at them throughout her entire employment with EchoStar. *See* Unemployment Hearing Tr. at 9:1-13; Am. Compl. ¶¶ 33, 35.

  In sum, then, Plaintiff's claim for hostile work environment sexual harassment fails because the harassment was not based on gender, was neither severe nor pervasive, and did not interfere with Plaintiff's job performance.

## III.  PLAINTIFF WAS NOT DISCRIMINATED AGAINST.

  A.  <u>The Elements of Her Claim</u>:

  Under Title VII, it is an "unlawful employment practice for an employer. . . to discriminate against any individual . . . because of such individual's . . . sex."  42 U.S.C. § 2000e-

2[a][1].   To establish a *prima facie* case of discrimination under Title VII, Plaintiff must demonstrate that:   (1) she is a member of a protected class; (2) Defendants took adverse employment action against her; and (3) Defendants imposed its adverse employment action under circumstances giving rise to an inference of discrimination.   *See Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000).

In analyzing claims for Title VII discrimination, courts apply the framework of shifting evidentiary burdens outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).   Plaintiff must, as a threshold matter, establish a *prima facie* case of discrimination.   *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001).   If Plaintiff establishes a *prima facie* case, the burden of production then shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action.   *Id.*   Even if Plaintiff could establish a *prima facie* case for discrimination, Defendants may rebut that case by offering a legitimate, nondiscriminatory reason for their decision.   *See McDonnell Douglas*, 411 U.S. at 804.   Plaintiff must then respond by demonstrating that Defendants' asserted reasons are a pretext for discrimination.   *See Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999).   The Tenth Circuit "requires a showing that the tendered reason for the employment decision was not the genuine motivating reason, but rather was a disingenuous or sham reason."   *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1988).

B.    The Elements Plaintiff Cannot Show:

Plaintiff's claim for sex discrimination fails because Plaintiff cannot establish a *prima facie* case of sex discrimination.   Her allegations do not demonstrate that she suffered any

adverse employment action.  Even if she could make out a *prima facie* case, however, Plaintiff cannot show that any action taken by EchoStar was pretext for discrimination.

        1.      Plaintiff Cannot Establish an "Adverse Employment Action."

An adverse employment action is a fundamental requirement of a claim under Title VII. *See Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1212-13 (10th Cir. 2003).  The existence of an adverse employment action is determined on a case-by-case basis and "does not extend to a mere inconvenience or an alteration of job responsibilities."  *Id.* (quoting *Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847, 857 (10th Cir. 2000)).  To be an adverse action, the employer's conduct must be "materially adverse" to the employee's job status.  *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 533 (10th Cir. 1998).  Here, Plaintiff did not suffer an adverse employment action.

First, Plaintiff did not lose her job.  When Mrs. Cartwright left EchoStar, Plaintiff was not terminated despite the fact that her services as Executive Assistant to Mrs. Cartwright were no longer needed.  *See* Statement of Fact ¶ 42.  EchoStar placed Plaintiff in another executive assistant position, with the same title and same pay, but reporting to a different executive.  Statement of Fact ¶ 45.  There is absolutely no evidence that this reassignment was based on Plaintiff's gender.  And Plaintiff subsequently resigned voluntarily; she was not terminated.  Statement of Fact ¶ 62.

Second, Plaintiff's compensation did not suffer:

Q.     Was your salary decreased once you started working for Mr. Kelly?
A.     No.
Q.     At any time while our worked for Mr. Kelly?
[. . .]
A.     It was not decreased.  True.
Q.     Actually, you received a raise in 2004, correct?

A.      Yes.
Q.      Who was your supervisor at EchoStar at the time you got that raise?
A.      When I received the raise, it was Mr. Kelly.
[. . .]
Q.      Were your benefits cut once you started working for Mr. Kelly?
A.      No.
Q.      Were they cut while you worked for Mr. Kelly?
A.      No.
Q.      Were you ever denied a bonus while your worked for Mr. Kelly.
A.      No.
Q.      Were you ever denied contributions into your retirement account when you worked for Mr. Kelly?
A.      No.
Q.      Were you ever denied stock options when your worked for Mr. Kelly?
A.      No.
Q.      Did you title stay the same between January 1 and July 14, 2004?
A.      Yes.

Baker Dep. 161:2-162:13.

Finally, Plaintiff was never denied a transfer.  Messrs. Kelly and Scarborough supported transferring her to a different position.  Kelly Dep. at 108:2-18; Scarborough Dep. at 84:25-85:12; 108:8-109:17.  Mr. Scarborough was actively seeking a different position for Plaintiff at the time she walked out.  Statement of Fact ¶¶ 83, 86; Scott Baker Dep. 52:14-25, 54:3-55:7, 55:10-23.  He even had a meeting with her the day she left to discuss a different position.  Scarborough Dep. at 116:7-11.  In sum, there was no conduct "materially adverse" to Plaintiff's job status.  *See Sanchez*, 164 F.3d at 533.  Without an adverse action, Plaintiff cannot establish a *prima facie* case for discrimination and her claim fails as a matter of law.  *See Wells*, 325 F.3d at 1212-13.

2.      The Change in Plaintiff's Job Duties Was Based on a Legitimate, Non-Discriminatory Reason.

Even if the change in job responsibilities that Plaintiff experienced when she switched from supporting Mrs. Cartwright to supporting Mr. Kelly could be considered an adverse

employment action, Plaintiff cannot show that this change was a pretext for gender discrimination.

When Mrs. Cartwright left EchoStar, her responsibilities were divided among several other executives, including Mr. Kelly.  Statement of Fact ¶ 42.  EchoStar retained Plaintiff and assigned her to support Mr. Kelly.  *Id*.  The requirements of Plaintiff's position were not altered. Statement of Fact ¶¶ 26, 44.  Any additional tasks Plaintiff had performed under Mrs. Cartwright were assigned at Mrs. Cartwright's discretion and were not part of the responsibilities of an executive assistant.  *See* Statement of Fact ¶¶ 24-28.  The fact that Mr. Kelly did not ask his executive assistants to provide those same services does not constitute an adverse employment action.  *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001) ("Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities.").

In addition, the tasks Plaintiff's performed for Mr. Kelly were the same as the tasks performed by other executive assistants who have supported Mr. Kelly.  Ms. Tomasek was employed as an Executive Assistant to Mr. Kelly from September 2002 through October 2003. Statement of Fact ¶ 25. As an Executive Assistant to Mr. Kelly, Ms. Tomasek's job duties were to manage his calendar, handle meeting requests, answer phones, take phone messages, handle people coming and going from Mr. Kelly's office, file, and create folders.  Statement of Fact ¶ 26.  Plaintiff performed similar tasks:[5] she set his calendar, assisted with travel arrangements,

---

[5] These tasks were also consistent with those performed for other EchoStar executives, including Mr. Dugan.  Ms. Tomasek worked as the Executive Assistant to Mr. Dugan from October 2003 until his retirement in April 2004. Statement of Fact ¶ 25.  As an Executive Assistant to Mr. Dugan, Ms. Tomasek's job duties were to manage his calendar, handle meeting requests, answer phones, assist with organization, and file.  Statement of Fact ¶ 27.

answered phones, prepared reports, filed, arranged meetings, dealt with customer complaints, and picked up his lunch, and located forms for foreign travel.  Statement of Fact ¶ 44.

Because Plaintiff cannot show an adverse employment action and Defendants have established a legitimate, non-discriminatory reason for the change in Plaintiff's job duties, her sex discrimination claim fails as a matter of law.

## IV.   THERE WAS NO RETALIATION AGAINST PLAINTIFF.

A.   <u>The Elements of Her Claim</u>:

To state a *prima facie* case of retaliation, a plaintiff must demonstrate: "(1) that [she] engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White,* --- U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)) (footnote omitted).  The materially adverse action must be subsequent to or contemporaneous with the protected opposition.  *Penry*, 155 F.3d at 1263-64.  Once a plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Argo*, 452 F.3d at 1202.  The burden then shifts back to the plaintiff to show that the employer's proffered reason is pretext.  *Id.* at 1203; *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1315-16 (10th Cir. 2006).

B.      The Elements Plaintiff Cannot Show:

Plaintiff's claim for retaliation fails because she cannot show a materially adverse action taken as a result of her protected activity.[6]

1.      Mr. Kelly's Stray Remark Was Not Materially Adverse.

Plaintiff's retaliation claim rests, in part, on the allegations that in response to her complaint about Mr. Kelly, he made an unkind remark to her.  *See* Statement of Fact ¶ 49.  Even if this remark was made, it was not a materially adverse action.  *See Burlington Northern*, -- U.S. at --; 126 S.Ct. at 2414-15 ("[Title VII's] anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.")

Plaintiff did not suffer any loss of compensation, or any change in benefits or employment status as a result of this comment.  Statement of Fact ¶ 45.  She was not "written-up" or reprimanded and no disciplinary proceedings were initiated against her.  Baker Depo. at 248:5-13.  She was not denied a transfer.  In fact, Mr. Kelly supported Plaintiff's efforts to find a different position because he understood that she was not being challenged in her current role.  July 9, 2004 email from Mr. Kelly (Exhibit FF hereto); Kelly Dep. at 108:2-18.  This comment also did not dissuade Plaintiff from making additional complaints to human resources.  Am. Compl. ¶ 62; Baker Dep. at 121:15-21; 4/27/05 Baker Aff. ¶ 6.  This alleged act of retaliation was not "materially adverse" to Plaintiff's job status; it had no impact on her.

2.      Plaintiff Voluntarily Resigned.

Plaintiff also asserts that she was constructively discharged in retaliation for reporting sexual harassment.   A constructive discharge claim requires a plaintiff to "show working

---

[6] For purposes of this Motion only, EchoStar does not dispute that Plaintiff engaged in protected activity.

conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). *See also Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) (plaintiff must show she had "no other choice but to quit."). Plaintiff's subjective belief is irrelevant. *Yearous*, 128 F.3d at 1356. "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005). Whether an employee is permitted to select the effective date of resignation is a factor indicating the resignation was not a constructive discharge. *Yearous*, 128 F.3d at 1356.

There are several problems with Plaintiff's theory that she was constructively discharged. First, if her constructive discharge claim is premised on her interactions with attorneys Noll and Welch on July 13th and 14th, then her argument fails because she had already submitted her letter of resignation prior to those interactions. *See* Statement of Fact ¶¶ 62, 63, 69, 74. In fact, Plaintiff left the same afternoon that she had planned to leave (July 14th) weeks prior to her interaction with attorneys Noll and Welch. Statement of Fact ¶¶ 65, 82. This means EchoStar could not have retaliated against Plaintiff as a matter of law because she had already resigned prior to the "retaliatory" act.

Second, if Plaintiff's constructive discharge claim is premised on the alleged hostile work environment,[7] that theory fails because (1) there is no temporal proximity between Plaintiff's

---

[7]  Even if Plaintiff is able to establish a *prima facie* claim for hostile work environment, that does not mandate a finding of constructive discharge. *See Campbell v. Kan. State Univ.*, 780 F. Supp. 755, 765-66 (D. Kan. 1991) ("Although a working environment may be severe enough to constitute sexual harassment, it may nevertheless be insufficiently intolerable or 'difficult' to compel a voluntary resignation.").

protected activity and her constructive discharge, and (2) Plaintiff was willing to stay with EchoStar in a new position (until she hired a lawyer).

      a.          No temporal proximity exists between Plaintiff's protected activity and her "discharge."

The timeliness of an employee's resignation is an important factor in the constructive discharge equation. *See Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991). If no act of harassment is alleged to have occurred within a reasonable time of an employee's resignation, there will not be grounds for a claim of constructive discharge. *See, e.g., Hirchfeld v. New Mexico Corrections Dept.*, 916 F.2d 572, 580 (10th Cir. 1990) (no constructive discharge because the plaintiff resigned months after her complaints of sexual harassment); *Steel v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989) (no constructive discharge when the last incident of harassment occurred twelve days before employee's resignation). Here, Mr. Kelly (the individual whom Plaintiff blames for the majority of her unhappiness) left for Africa on or around June 26, 2004, <u>eleven days</u> before Plaintiff submitted her letter of resignation. Statement of Fact ¶ 59. And Plaintiff's letter of resignation gave two more weeks' notice. *See* Exhibit Y.

Further, although courts have not articulated an explicit "same-continent" rule, logic dictates that the individual who makes an employee's work environment so intolerable that the employee must leave, should at least have to be on the same continent as the employee. Here, Mr. Kelly had not been in the United States for a week and-a-half before Plaintiff resigned, and for two and-a-half weeks before she left the Company. Statement of Fact ¶¶ 59, 62, 82. And Plaintiff did not communicate with Mr. Kelly after he left the country. Statement of Fact ¶ 61.

Moreover, the only acts of "harassment" by Mr. Kelly prior to Plaintiff's resignation occurred (once) in March, (once) in April, and (once) in May.  Statement of Fact ¶¶ 47, 54, 57.  Even the Pepsi incident (which cannot be construed to be gender-based harassment) occurred in June 2004 – almost <u>a full month</u> before Plaintiff's resignation.  Statement of Fact ¶ 61.  In addition, Mr. Dugan retired from EchoStar on or around April 29, 2004, <u>two and a half months</u> before Plaintiff resigned;[8] and Plaintiff's allegations about Mr. Kondalis relate to a joke in March, 2004, <u>four months</u> before she resigned.  Statement of Fact ¶¶ 53, 55.

Finally, <u>Plaintiff</u> selected the effective date of her resignation to be two weeks after she submitted her resignation.  Statement of Fact ¶ 65.  According to the Tenth Circuit, this means Plaintiff cannot have been constructively discharged.  *See Yearous*, 128 F.3d at 1356.  Thus, even viewing Plaintiff's allegations as true, there is no evidence that objectively, she "had no choice but to quit."  *See id.*  Plaintiff resigned of her own free will, on her own terms, while her supervisor was out of the country on a lengthy vacation.

b.      Plaintiff refused a transfer within EchoStar.

To establish a constructive discharge, Plaintiff must show that at the time of her resignation, "[her] employer did not allow [her] the opportunity to make a free choice regarding [her] employment relationship."  *Baca*, 398 F.3d at 1217-18.  *See also Sanchez*, 164 F.3d at 534 (no constructive discharge where plaintiff was not faced with the sole option of quitting and failed to pursue transfer opportunities); *Pascouau v. Martin Marietta Corp.*, 994 F. Supp. 1276 (D. Colo. 1998) (plaintiff who was laid off after she refused to accept position in another

---

[8]  As stated in footnote 3, Defendants object to Plaintiff's amendments to her deposition testimony on the grounds that they are beyond the amendments contemplated by Fed. R. Civ. P. 30(e).  Plaintiff must have realized upon reviewing her testimony that any action by Mr. Dugan could not have possibly taken place in May or June because Mr. Dugan was retired by that time.  Thus, she changed the dates to March or April to make her story plausible.

department was not constructively discharged).  Here, Plaintiff's constructive discharge claim also fails because she failed to take advantage of other available positions at EchoStar.  Plaintiff testified that she was willing to tear up her letter of resignation and remain with the Company if human resources found her a different position.  Baker Dep. at 231:5-232:4.  She even had a meeting with Mr. Scarborough on July 14th to discuss a new position.  Scarborough Dep. at 116:7-11.  She walked out, however, before Mr. Scarborough had the opportunity to meet with her.  Statement of Fact ¶ 83.  All Plaintiff said to Mr. Scarborough on her way out was "it did not have to be this way";  she never gave him the chance to address a transfer.  Statement of Fact ¶ 83; Baker Dep. at 50:10-13.  When Mr. Scarborough called Plaintiff later that day, she did not call him back.  Statement of Fact ¶ 84.  Mr. Scarborough called Plaintiff again that week, but Plaintiff would not allow him to address the transfer.  Statement of Fact ¶ 85.

Based on the undisputed testimony, Plaintiff was ready and even willing to stay at EchoStar up to her last day on the job – a clear indication that the working conditions were not so intolerable that she had no choice but to leave.  *See* Baker Dep. at 231:5-232:4.  In addition, Mr. Scarborough was ready to talk with Plaintiff about another opportunity, but she walked out before they could meet.  *Id.*; Statement of Fact ¶¶ 82-83.  Plaintiff was not faced with the sole option of quitting.

Because Plaintiff was not constructively discharged as a matter of law, and she did not suffer any adverse employment action based on her protected activity, Plaintiff's claim for retaliation should be dismissed as a matter of law.

**V.   THERE WAS NO EMPLOYMENT CONTRACT BETWEEN PLAINTIFF AND ECHOSTAR THAT COULD HAVE BEEN BREACHED.**

     A.   <u>The Elements of Her Claim</u>:

The existence of an enforceable contract is an essential element of the *prima facie* case Plaintiff must prove to establish her breach of contract claim.  *See Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).   A valid, enforceable contract exists when a plaintiff can show the employer in promulgating certain procedures was making an offer to the employee and that the employee's assent constituted acceptance of and consideration for those procedures.  *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 711 (Colo. 1987).   "The primary goal of contract interpretation is to determine and give effect to the intent of the parties." *Ad Two, Inc. v. City and County of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000).  "The intent of the parties to a contract is to be determined primarily from the language of the instrument itself." *Id.* "In ascertaining whether certain provisions of an agreement are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed." *Id.* "Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language." *Id*.

     B.   <u>The Elements Plaintiff Cannot Show</u>:

Plaintiff's claim for breach of contract asserts that the Employee Handbook constituted a contract and promised: (1) EchoStar would protect employees from sexual harassment and from retaliation; and (2) EchoStar would protect employees from intimidation and threats. Am. Compl.  ¶¶ 95-105; 134-142.  Summary judgment is appropriate on these claims for two reasons:

(1) the Employee Handbook is not a contract as a matter of well-established law; and (2) the assurances "offered" by these policies are too vague to be enforceable.

1.     EchoStar Did Not "Offer" To Enter Into A Contract.

Colorado courts have consistently held that summary judgment is appropriate when a handbook contains a clear and conspicuous disclaimer. *Ferrera v. A.C. Nielsen*, 799 P.2d 458, 461 (Colo. App. 1990); *see also Hoyt v. Target Stores*, 981 P.2d 188, 193 (Colo. App. 1998) (upholding the trial court's grant of summary judgment as to plaintiff's implied contract claim "because conspicuous disclaimer in Target's employee handbook precluded an enforceable unilateral offer"); *Middlemist v. BDO Seidman, LLP*, 958 P.2d 486, 494 (Colo. App. 1997) (summary judgment appropriate when disclaimers were sufficiently clear to maintain an at-will employment relationship regardless of other termination policies and procedures).   Whether a disclaimer is clear and conspicuous is a question of law.   *Silchia v. MCI Telecom. Corp.*, 942 F. Supp. 1369, 1374 (D. Colo. 1996).   In making such a finding, considerations include the language of the disclaimer, location within the manual, and the disclaimer's type, size, and font. *Id.* at 1375.

EchoStar's disclaimers clearly defeat any argument that the Company intended to enter into a contract with Plaintiff.   The first page of the Employee Handbook contains the following notice in large, bold, capitalized font: "THE LANGUAGE USED IN THIS HANDBOOK DOES NOT CREATE OR CONSTITUTE A CONTRACT OF EMPLOYMENT WITH ANY EMPLOYEE, EITHER EXPRESS OR IMPLIED."   Statement of Fact ¶ 17.   Upon receipt of the Employee Handbook, Plaintiff acknowledged that:  "I understand that nothing in this Handbook in any way creates an express or implied contract of employment between Company and me."   Statement of Fact ¶ 21.   By

signing this, Plaintiff expressly acknowledged that the Employee Handbook was not a contract. Furthermore, EchoStar also reserved discretion to interpret, apply, or discontinue its guidelines at any time.  Statement of Fact ¶¶ 16, 17, 21.  Such a reservation is entirely inconsistent with an ongoing, binding contract.

This case is analogous to *Therrien v. United Air Lines*, 670 F. Supp. 1517 (D. Colo. 1987), in which the court applied Colorado law to determine whether United's personnel documents could be construed to create a contract that the plaintiff could only be terminated for cause.  Analyzing the employee handbook, "You and United," and the company regulations, Series 15, which stated that the documents did not constitute a contract and were subject to change, the court granted United's motion for summary judgment finding that no implied contract existed.  *Id.* at 1522.  Just like "You and United," EchoStar's Employee Handbook contains clear and conspicuous disclaimers, in large font, that are stated prominently at the beginning of the Employee Handbook and again right above the signature line on the Acknowledgment of Receipt.  Statement of Fact ¶¶ 17, 21.  The intent of the parties is clear and free of ambiguity:  EchoStar did not offer, and Plaintiff did not interpret the Employee Handbook as a contract.  *See* Statement of Fact ¶ 12.

To find otherwise would discourage any employer from providing an employee handbook:

> Employers who have large numbers of employees or who have complicated company policies find themselves in a precarious position. If these employers do not promulgate any sort of policy manual, they may be required to formulate employee policy on an ad hoc basis and face administrative chaos. Conversely, if they do issue a manual and comply with its procedures to such a degree that their employees reasonably expect them to continue to do so in the future, they may be subjected to unintended contractual liability.

Michael W. Wallace, " *Employee Manuals as Implied Contracts: The Guidelines That Bind,*" 27 Tulsa L.J. 263, 263-64 (1991).  It would also deprive employees of useful safety information and "communication processes within the company that are important for maintaining a positive work environment." *Sanchez v. Life Care Centers of America, Inc.*, 855 P.2d 1256, 1261 (Wyo. 1993) (Cardine, J. dissenting).

        2.      The "Contract" Terms Are Too Vague To Be Enforceable.

Under Colorado law, an employer's "vague assurances" of fair treatment are "too indefinite to constitute a contractual offer which would enable a court to determine whether a contract has been performed." *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1465 (10th Cir. 1994).  "[A] promise to prohibit unlawful conduct is illusory, since an employer is required to follow the law whether it promises to do so or not." *Boeser v. Sharp*, 2006 WL 3703932, *2 (D. Colo. 2006).

For an oral or written statement by an employer to create an enforceable contract, the statement must meet two requirements:

> It must disclose a promissory intent or be one that the employee could reasonably conclude constituted a commitment by the employer.  If it is merely a description of the employer's present policies, it is neither a promise nor a statement that can reasonably be relied upon.  In addition, the employer's statement must be sufficiently definite to allow a court to understand the nature of the obligation taken.

*Hoyt*, 981 P.2d at 194 (emphasis added); *accord Soderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616, 620 (Colo. App. 1997).

EchoStar's Guidelines do not meet these two requirements.  None of the Guidelines demonstrate a promissory intent; they are merely statements of EchoStar's "present policies" against unlawful retaliation and discrimination.  Statement of Fact ¶¶ 18-20.  Second, the

Guidelines fail to create a contract between EchoStar and Plaintiff because none of them is "sufficiently definite to allow a court to understand the nature of the obligation taken." *Hoyt*, 981 P.2d at 194. For a statement to create an employment contract, it must consist of more than "general aspirational statements," a company's "general commitment to [take] affirmative action" to ensure fairness and equality, or "general indefinite policy statements." *Marsh v. Delta Air Lines, Inc.*, 952 F. Supp. 1458, 1466 (D. Colo. 1997); *Vasey*, 29 F.3d at 1465; *Orback v. Hewlett-Packard Co.*, 97 F.3d 429, 432 (10th Cir. 1996). Each statement must contain "detailed lay-off guidelines or other guarantees of employment," "specific procedures for termination of employment," or "detailed or mandatory provisions or guidelines." *Vasey*, 29 F.3d at 1465; *Fejes v. Gilpin Ventures, Inc.*, 960 F. Supp. 1487, 1496 (D. Colo. 1997); *Lawson v. Science Applications Int'l Corp.*, 894 F. Supp. 378, 381 (D. Colo. 1995).

Colorado state and federal courts have repeatedly held that such statements as the Guidelines at issue here are insufficient to create an enforceable contract between an employer and an employee. In *Vasey*, for example, the employee argued that the employer had created an implied contract by promulgating a "Credo" and an "equal employment opportunity memorandum." The Credo stated that the employer "believes in the highest ethical standards," and that it was "committed to just management and equality for all . . . and respecting the dignity and privacy due all human beings." *Vasey*, 29 F.3d at 1465. The equal opportunity memorandum "set[ ] forth Defendant's commitment to 'provide equal employment . . . regardless of face, sex, age, handicap, religious belief, honorable military status or national origin.'" *Id.* The Colorado Court of Appeals held that the documents were insufficient as a matter of law to support an implied contract claim:

Defendant's Credo and equal opportunity memorandum do not contain detailed lay-off guidelines or other guarantees of employment.  Rather, Defendant's Credo merely includes general statements to the effect that it is committed to "the dignity and privacy due all human beings" and providing "a safe and healthy workplace." Likewise, Defendant's equal opportunity memorandum merely states the company's general commitment to affirmative action.  Statements such as these are merely "vague assurances," see Dupree v. United Parcel Serv., 956 F.2d 219, 222 (10th Cir. 1992)], and too indefinite to constitute a contractual offer which would enable a court to determine whether a contract has been performed.  Accord id. (statement of "[w]e treat our people fairly and without favoritism" too vague to create an implied contract under Oklahoma law).  We therefore conclude Defendant's Credo and equal opportunity memorandum do[] not support Plaintiff's implied contract claim.

Id. at 1465-66.

Similarly, in Marsh, 952 F. Supp. 1458, the District Court for the District of Colorado granted summary judgment on a breach of contract claim based on Delta's Business Conduct Policy.  That policy – which set forth "'the principles of business ethics and conduct that each of us must follow in dealings on behalf of the company with . . . other Delta personnel,'" id. at 1466 – contained the following statements:  (a) "'Delta stands for the best in service and for fair dealings;'" (b) "'Delta is firmly committed to a policy of equal opportunity;'" (c) "'Delta's equal opportunity program . . . consists of the following policies and objectives: . . . continuing the company's goal of . . . fair treatment of all personnel;'" and (d) "'[n]o disciplinary action will be taken against an employee solely for disclosing wrongdoing.'"  Id.  The court held that these statements did not create an enforceable contract:

[T]he "promises" contained in the documents cited by Plaintiff can, at best, be considered vague assurances.  In Vasey, the Tenth Circuit concluded that documents that contained general aspirational statements, but that did not contain "detailed lay-off guidelines or other guarantees of employment" were not sufficient to support an implied contract claim.  Vasey, 29 F.3d at 1465-66.  Like the documents in question in Vasey, the statements in Delta's documents do not set forth any employment terms, explain disciplinary procedures, or detail any

prohibited conduct.   Instead, the statements are best characterized as "vague assurances" that cannot be the basis for an implied contract.

*Marsh*, 952 F. Supp. at 1466-67.   *See Fejes*, 960 F. Supp. at 1496 (statements in handbook that "[t]he company is an equal opportunity employer and does not discriminate against its employees, or applicant[s] for employment, because of race, religion, creed, national origin, handicap, age or sex" did not create contract); *Lawson*, 894 F. Supp. at 381 (D. Colo. 1995) (five statements, including "'We will treat our fellow employees honestly and fairly, and shall insure equal opportunity for employment and advancement'" "could not serve as the basis for an implied contract"); *Hoyt*, 981 P.2d at 194 (testimony that managers employed "'industrial due process' to 'keep fair and consistent policy throughout the store'" was merely a "vague assurance of fair and consistent treatment" that did not create contract); *Johnson v. Cadillac Plastics Group, Inc.*, 908 F. Supp. 847, 851-52 (D. Colo. 1995) (equal opportunity statement in handbook did not constitute offer of employment); *Orback*, 97 F.3d at 429 (company's philosophical statements about employee treatment do not create an implied contract that abrogates employment at will).

The statements in *Vasey*, *Marsh*, *Fejes* and the other cases cited above are strikingly similar to the statements here.  The "commitment to 'provide equal employment . . . regardless of race, sex, age, handicap, religious belief, honorable military status or national origin,'" set forth in the equal opportunity memorandum in *Vasey* – and the statement that "[t]he company is an equal opportunity employer and does not discriminate against its employees, or applicant[s] for employment, because of race, religion, creed, national origin, handicap, age or sex" set forth in the handbook in *Fejes* – for example, are essentially identical to the Guideline in EchoStar's Employee Handbook that the Company "provides equal employment opportunities (EEO) to

qualified employees and applicants for employment without regard to race, sex, age, national origin, disability or veteran status." *See* Statement of Fact ¶ 18.

Likewise, the statement in *Marsh* that "'[n]o disciplinary action will be taken against an employee solely for disclosing wrongdoing'" is for all intents and purposes the same as the statements in EchoStar's Guidelines that "EchoStar does not tolerate or condone any form of retaliation or reprisal against an employee who has made a good faith complaint of harassment or discrimination," and "EchoStar seeks to maintain a work environment free from intimidation, threats or violent acts." Statement of Fact ¶¶ 19-20. The same rule applies to EchoStar's Guidelines in this case that applied to the statements in the cases cited above: They are "merely 'vague assurances'" that do not support Plaintiff's breach of contract claim. *See Vasey*, 29 F.3d at 1465-66.

## VI.    DEFENDANTS DID NOT ENGAGE IN OUTRAGEOUS CONDUCT.

### A.    The Elements of Her Claim:

Plaintiff's outrageous conduct claim is based on interactions Plaintiff had with EchoStar's outside counsel from Texas, David Noll and Wade Welch. Plaintiff alleges that they told her she did not witness any discrimination against Mrs. Cartwright, and that Plaintiff could not leave EchoStar unless she signed an affidavit.

To establish a *prima facie* case of outrageous conduct, Plaintiff must show by a preponderance of the evidence that: (1) Defendants engaged in extreme and outrageous conduct; (2) Defendants engaged in the conduct recklessly or with the intent of causing Plaintiff severe emotional distress; and (3) Plaintiff incurred severe emotional distress which was caused by Defendants' conduct. *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994).

B.     The Elements Plaintiff Cannot Show:

Plaintiff's claim fails under all three prongs.

1.     Noll and Welch's Actions Were Not Outrageous as a Matter of Law.

Whether a defendant's conduct was outrageous is first for the Court to decide. *Schackelford v. Courtesy Ford, Inc.*, 96 F. Supp. 2d 1140, 1146 (D. Colo. 2000). If reasonable men could not disagree on the outrageous conduct issue, Defendant is entitled to judgment as a matter of law. *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665-66 (Colo. 1999). For a defendant's actions to constitute outrageous conduct, the acts must be

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Rugg v. McCarty*, 476 P.2d 753, 756 (1970). "[L]iability. . . does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Schackelford*, 96 F. Supp. 2d at 1146 (quoting Restatement (Second) of Torts § 46, cmt. d (1965)).

In *Coors*, the plaintiff alleged that Coors "engaged in an extensive criminal conspiracy involving illegal drugs and money laundering and that Coors fired [plaintiff] to scapegoat him for these crimes." 978 P.2d at 666. At management's direction, the plaintiff had "performed surreptitious narcotics investigations of Coors employees." *Id*. at 664. Outside legal counsel advised Coors not to participate in these investigations because of unwarranted legal risks, including the potential for civil rights litigation. *Id*. The plaintiff then alleged that "[d]espite this advice, Coors conspired with its outside legal counsel to continue these investigations and to conceal Coors's involvement. . . ." *Id*. Also, outside counsel and a senior executive "directed

[the plaintiff] to 'bury' evidence of the drug investigations." *Id.* Several years later, Coors fired the plaintiff "in order to protect themselves from liability for their orchestration of the drug investigations and related money-laundering scheme." *Id.* at 665. Even viewing these allegation as true, the Colorado Supreme Court held that "no reasonable person could find that Coors's alleged scapegoating of [the plaintiff] arose to the high level of outrageousness required by our case law. . . ." *Id.* at 666.

Further, by law, a disagreement with a superior is not outrageous as a matter of law. *See Steinberg v. Thomas*, 659 F. Supp. 789, 791, 795-96 (D. Colo. 1987) (plaintiff's discharge following an altercation with his supervisor at a staff meeting did not support a claim of outrageous conduct). Similarly, a disagreement with an employer regarding whether a certain act is lawful or unlawful is not outrageous as a matter of law. *See Vaske v. DuCharme, McMillen & Assocs., Inc.*, 757 F. Supp. 1158, 1165 (D. Colo. 1990) (defendant's firing of plaintiff employee for refusing to sign no-compete clause when the defendant allegedly knew that its covenant not to compete was illegal was not outrageous conduct). Even yelling at someone and pounding on a fax machine is not outrageous as a matter of law. *See Hounton v. Gallup Indep. Co.*, 113 Fed. Appx. 329, 334 (10th Cir. 2004) (unpublished) (applying New Mexico law and holding that screaming at an employee, calling him a "lazy ass," and making him cry was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.")[9]

---

[9] Consistent with 10th Cir. R. 32.1 a copy is attached herewith as Exhibit GG.

Although being asked to testify against a friend may be unpleasant, it is not outrageous. None of the actions taken by attorneys Noll and Welch in interviewing Plaintiff about Mrs. Cartwright's allegations were "utterly intolerable in a civilized society." *See Rugg*, 476 P.2d at 756. Mr. Noll never presented Plaintiff with an affidavit for her signature (Statement of Fact ¶¶ 76, 79), so her allegation that she was asked to sign a "false" affidavit is based upon her speculation of what the affidavit might contain once it was drafted. Upon Plaintiff's request that the affidavit process continue with her attorney present, the conversation with Mr. Noll ceased. Statement of Fact ¶ 72. Mr. Noll never yelled at Plaintiff. Statement of Fact ¶ 73. And no one did anything to restrain Plaintiff physically from leaving the building. Baker Dep. at 227:12-228:9. In fact, after the exchange with Mr. Welch on July 14, Plaintiff walked out, went to visit Mrs. Cartwright, and then went to happy hour with her co-workers. Cartwright Dep. 116:19-117:4; 117:17-23; 130:18-131:8; Beall Dep. 138:9-140:18; Scott Baker Dep. 72:25-73:10, 73:16-76:14. Neither Mr. Noll nor Mr. Welch contacted Plaintiff directly after July 14, 2004. *See* July 20, 2004 Letter from David Noll to Thomas Arckey (Exhibit HH). All further communications went through Plaintiff's attorney. *Id*. Attorneys Noll and Welch did not terminate Plaintiff and had no authority to terminate Plaintiff. At most, Mr. Welch pounded on Plaintiff's fax machine and told her that she had to sign an affidavit before she left on vacation. Statement of Fact ¶¶ 74, 76. This is not outrageous conduct.

In *Rawson v. Sears Roebuck & Company*, 530 F. Supp. 776, 779-80 (D. Colo. 1982), the court analyzed Colorado case law in attempt to find guidance on what behavior rose to the level of outrageous conduct. The court concluded that unless the conduct involves a public or quasi-public figure, then there must be a "*pattern of conduct* that either has intended to cause or

recklessly did cause severe emotional distress." *Rawson*, 530 F. Supp. at 780 (emphasis added). Here there was one brief telephone conversation with Mr. Noll and one meeting with Mr. Welch. Statement of Fact ¶¶ 69, 74. This is at most an isolated incident, and is insufficient to establish a "pattern of conduct."

> 2. Attorneys Noll and Welch Did Not Act Recklessly or With Intent To Cause Plaintiff Emotional Distress.

Even if Plaintiff could demonstrate that the conduct by attorneys Noll and Welch was outrageous as a matter of law, she cannot demonstrate that they engaged in such conduct recklessly or with intent to cause Plaintiff emotional distress.

"A person acts with intent to cause severe emotional distress when he engages in conduct with the purpose of causing several emotional distress to another person, or he know that his conduct is certain or substantially certain to have that result." *Culpepper*, 877 P.2d at 882. "A person acts recklessly in causing severe emotional distress in another if, at the time of the conduct, he knew or reasonably show have known that there was a substantial probability that his conduct would cause severe emotional distress to the other person." *Id.* at 882-83. "Just being an insensitive churl. . . does not give rise to liability." *Price v. Fed. Express Corp.*, 660 F. Supp. 1388, 1396 (D. Colo. 1987).

Attorneys Noll and Welch did not contact Plaintiff with the specific intent of causing her emotional harm. They contacted her because she may have had knowledge about Mrs. Cartwright's claims. Statement of Fact ¶ 68. Mr. Noll never pressured Plaintiff to answer questions without her counsel present. Unemployment Hearing Tr. 24:12-16, 25:7-13; Noll Dep. 67:16-70:18; Baker Dep. at 217:10-18. Mr. Welch later spoke to Plaintiff, but it is undisputed that when he approached her he did not know that Plaintiff wanted the advice of counsel before

proceeding.  Statement of Fact ¶ 74.  Further, Mr. Welch did not ask Plaintiff questions about the events giving rise to Mrs. Cartwright's claims.  Welch Dep. at 46:18-47:11, 49:14-50:8.  And once Plaintiff left EchoStar, neither Mr. Noll nor Mr. Welch attempted to contact her again without going through her attorney.  *See* Exhibit HH.  These actions do not show that attorneys Noll and Welch "chose a course of action with the knowledge of facts that would create a strong probability of injury" to Plaintiff.  *See Culpepper*, 877 P.2d at 883.  They were simply attorneys trying to do their jobs by attempting to talk to an employee about her former supervisor.

3.     Plaintiff Did Not Suffer Emotional Distress

The severe emotional distress caused by outrageous conduct "must be of such a character that no reasonable person could be expected to endure it."  *Daemi v. Church's Fried Chicken*, Inc., 931 F.2d 1379, 1389 (10th Cir. 1991) (internal citation omitted).  It is often accompanied by "shock, illness, or other bodily harm."  *Id.*; *Culpepper*, 877 P.2d at 882.

In *Daemi*, the Tenth Circuit held that being sick to one's stomach, seeing a therapist on one occasion, feeling insecure, nervous and unrestful, and not joking anymore, are insufficient as a matter of law to establish emotional distress. 931 F.2d at 1389. Here, Plaintiff's symptoms are similarly insufficient.  Plaintiff suffered humiliation and a loss of self-esteem; she lost of interest in gardening; she did not go out as often, she cried, and she "watched [her] dreams just go out the window."  Scott Baker Dep. at 31:21-32:18; 37:23-38:17; 150:16-151:3; Baker Dep. at 260:23-261:15.  Plaintiff did not see a therapist or mental health professional, despite the opportunity to do so.  Baker Dep. at 259:22-260:6; Scott Baker Dep. at 133:7-24.  This distress is not so severe as a matter of law, such that no reasonable person could endure it.  *See Daemi,* 931 F.2d at 1389.

Thus, even viewing the facts in the light most favorable to Plaintiff, her allegations do not rise to the level of severity and indignity that justify a claim for outrageous conduct, there is no evidence that the actions by attorneys Noll and Welch were undertaken recklessly or with intent to cause harm, and Plaintiff did not suffer severe emotional distress.   Accordingly, Plaintiff's claim for outrageous conduct fails as matter of law.

## CONCLUSION

For the reasons set forth above, Defendants request the Court grant judgment in their favor and against Plaintiff on the claims alleged in Plaintiff's Amended Complaint.

Dated:  February 12, 2007.

/s Carey R. Gagnon
Meghan W. Martinez
Carey R. Gagnon
Brownstein Hyatt Farber Schreck, P.C.
Suite 2200
410 Seventeenth Street
Denver, CO  80202-4437
Phone: 303.223.1100
Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 12th day of February, 2007, a true and correct copy of the foregoing **DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

RobertTruhlar@worldnet.att.net

tja@arlaw.us

BROWNSTEIN HYATT FARBER SCHRECK, P.C.

/s Carey R. Gagnon
Meghan W. Martinez
Carey R. Gagnon
410 17th Street, Suite 2200
Denver, Colorado 80202
(303) 223-1100

ATTORNEYS FOR DEFENDANTS