IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 06-cv-01103-PSF-BNB

SHARON R. BAKER,

      Plaintiff,

v.

ECHOSTAR COMMUNICATIONS CORPORATION;
ECHOSPHERE, L.L.C.; and
ECHOSPHERE SATELLITE, L.L.C.,

      Defendants.

---

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

This employment discrimination matter comes before the Court on Defendants'

Motion for Summary Judgment filed February 12, 2007 (Dkt. # 64), which is accom-

panied by a 56-page supporting brief and some 36 multi-page, multi-part exhibits

labeled Exhibits A-HH ("Defendants' Brief") (Dkt. # 65).  On April 3, 2007, plaintiff filed

her response to the motion, consisting of a 96-page brief and Exhibits 1 through 39

(Plaintiff's Response) (Dkt. # 93).  On May 9, 2007, defendants filed a reply brief in

support of their motion, together with 11 more exhibits labeled Exhibit II through SS

(Dkt. # 102).  On August 10, 2007, defendant filed a "Supplemental Submission" in

support of its motion for summary judgment (Dkt. # 147).  On August 29, 2007, plaintiff

filed a response to the defendants' supplemental submission (Dkt. # 148).[1]

---

[1]  Plaintiff asserts that the defendants' supplement should be stricken because
defendants did not confer before filing as required by D.C.COLO.LCivR 7.1A.  The Court does
not agree, as the supplemental submission is part of a motion for summary judgment, which is
an exception from the requirement to confer.

On May 18, 2007, a Final Pretrial Order was entered by the Magistrate Judge (Dkt. # 104). This case is set for an eight-day trial to a jury commencing February 11, 2008. The Court finds that oral argument on defendants' motion will not materially assist the Court. The defendants' motion is now ripe for determination.

## I.    BACKGROUND

As alleged in her amended complaint, plaintiff Sharon Baker began working for Defendant EchoStar Satellite, LLC in November 1998 as an executive assistant to Ms. Soraya Hesabi-Cartwright, the vice-president of Dish Network (Amended Complaint, Dkt. # 20, ¶ 29). The parties have stipulated, for purposes of this lawsuit, that the three named defendants, although apparently separate corporate entities, shall collectively be referred to as "EchoStar" and deemed to be plaintiff's employer solely for purposes of this case (Final Pretrial Order, Stipulations, ¶ 6). The Court will therefore refer to the defendants collectively as "EchoStar," or simply as "defendant."

After Ms. Cartwright left EchoStar in December 2003, plaintiff was assigned to work for Michael Kelly, who replaced Ms. Cartwright as vice-president of Dish Network. Commencing in January 2004, plaintiff began work in EchoStar's "executive suite" (Amended Complaint, ¶¶ 37-38). Plaintiff continued working at EchoStar for Mr. Kelly through July 7, 2004, when she submitted her "notice of intent to resign" to be effective July 21, 2004 (*id.*, ¶ 70).

Plaintiff alleges that management of EchoStar tolerated "yelling and screaming" towards employees in the executive suite, including the use of "profane and vulgar language." *Id.*, ¶ 41. Plaintiff alleges that during the time she reported to Mr. Kelly

she was subjected to profane, hostile, and abusive behavior by Mr. Kelly, including being subjected to sexual jokes about females and the female anatomy, and a continuing pattern of crude, rude and insolent behavior (*id.*, ¶ 42). The amended complaint, the parties' briefs and the referenced exhibits quote at length the profane, vulgar and abusive language used, and detail the alleged actions about which plaintiff complains, but they need not be repeated here. Suffice it to say that plaintiff alleges that she complained about Mr. Kelly's actions and the conduct of others to Mr. John Scarborough, the company's human resources senior vice-president, but she alleges Mr. Kelly's behavior did not improve, nor did EchoStar discipline him or others for the alleged improper conduct (*id.*, ¶¶ 59, 66-67).

Plaintiff further alleges that she requested Mr. Scarborough to transfer her to another position within the company but he "refused to permit the transfer." *Id.*, ¶¶ 68-69. Accordingly, because EchoStar allegedly refused to "correct the situation," because of Mr. Kelly's alleged retaliation against her, and because of alleged "reduction in her job duties," plaintiff on July 7, 2004 decided to submit her notice of intent to resign (*id.*, ¶ 70). Plaintiff claims that she was constructively discharged from EchoStar (*id.*, ¶ 94).

Plaintiff further alleges that on July 13 and 14, 2004, after she submitted her letter of intent to resign but before she left the company, she was contacted by outside attorneys representing EchoStar regarding a discrimination lawsuit brought against the company by Ms. Cartwright (*id.*, ¶¶ 73, 79). Plaintiff alleges the attorneys attempted to get her to sign an affidavit containing inaccurate phrasing of her statements, and that

when she refused to sign the affidavit the attorneys "yelled and screamed" at her (*id.*, ¶¶ 81-82) and acted in an aggressive and threatening manner (*id.*, ¶¶ 83-88). Plaintiff claims she left the EchoStar facility on July 14, 2004 as a result of this conduct and she apparently did not thereafter return to work.

On April 27, 2005, plaintiff filed a charge of discrimination with the EEOC. On March 16, 2006, she received a notice of right to sue from the EEOC. The original complaint in this case was filed June 9, 2006 (Dkt. # 1). The amended complaint was filed August 29, 2006 (Dkt. # 20).

## II.   PLAINTIFF'S CLAIMS

Based on the above events, plaintiff asserts five claims for relief, three under Title VII, 42 U.S.C. § 2000e, *et seq.*, and two state law claims. She first claims that she was subjected to a hostile work environment and sexual harassment during her employment at EchoStar (First Claim for Relief). Although not expressly set forth in the amended complaint, she alleges that she was subjected to the hostile environment before and during the period of time she was reporting to Mr. Kelly and working out of the executive suite (Final Pretrial Order at 4).

She next claims that she was discriminated against based on her gender in the terms and conditions of her employment (Second Claim for Relief). This claim apparently relates primarily to her alleged constructive discharge, the alleged refusal to transfer her out of the executive suite, and perhaps to an alleged reduction in her job responsibilities resulting in the assignment of only the "most rudimentary and basic tasks (Final Pretrial Order at 5).

Third, she alleges retaliation for complaining about sexual discrimination (Third Claim for Relief ). This claim apparently arises from Mr. Kelly's reaction to her after she complained about his conduct, as well as her allegation that she was denied a transfer out of the executive suite (*id.* at 5-6).

Her Fourth Claim for Relief asserts a breach of contract by EchoStar for allegedly failing to enforce provisions in an employee handbook containing written policies prohibiting discrimination, harassment, retaliation, threats and intimidation by or against EchoStar employees (*id.* at 6-7).

The Fifth Claim for Relief in plaintiff's amended complaint alleges that the actions of the outside counsel in seeking to obtain her affidavit constitute intentional extreme and outrageous conduct which caused her "severe emotional distress" for which she is entitled to damages for "mental pain and suffering." (Amended Complaint, ¶¶ 148-149). However, in the Final Pretrial Order plaintiff also apparently asserts that the conduct she was exposed to in the executive suite constitutes outrageous conduct (*See* Final Pretrial Order at 8-9).

As relief, plaintiff seeks back pay, lost wages and benefits, compensatory damages for her alleged emotional distress, pain and mental anguish, punitive damages for defendant's intentional conduct, as well as declaratory and injunctive relief (*id.* at 19).

## III.     DEFENDANT'S MOTION AND PLAINTIFF'S RESPONSE

Defendant argues that it is entitled to summary judgment as to all five of plaintiff's claims. First, although apparently not denying that abusive or profane

language was used in the executive suite, defendant argues that the evidence of record shows that the abuse was not generally directed at plaintiff, that any comments she may have heard were mere "stray" comments, that the comments were not gender-based, and therefore the alleged conduct was not sufficiently severe and pervasive to be actionable under Title VII. Defendant also asserts that any comments that were made, or conduct which occurred, more than 300 days before plaintiff filed her EEOC charge on April 27, 2005 cannot be the basis for a claim of hostile work environment (Defendant's Brief at 19-31).

Defendant further argues that plaintiff suffered no adverse employment action that gives rise to a claim of discrimination, and that it had legitimate non-discriminatory reasons for changing plaintiff's job responsibilities after she began reporting to Mr. Kelly (*id.* at 31-36). It asserts that it did not ignore her complaints, or retaliate against her, but rather it did seek other positions for her within the company after she complained, and that she abruptly walked off the job before a transfer could be arranged (*id.* at 40-41). It further asserts that plaintiff was not constructively discharged, and there was not "temporal proximity" between her complaints and the time she left her job (*id.* at 39-40).

Defendant denies that it entered into an employment contract with plaintiff, asserting that its written employment policies are mere "vague assurances" that do not constitute an enforceable contract (*id.* at 42-49) and that plaintiff did not reasonably rely on the handbook provisions.

Defendant argues that the conduct of the outside attorneys was not outrageous or even inappropriate (*id.* at 49-53).  It further argues that plaintiff cannot show that she suffered "severe emotional distress" as a result of such contacts (*id.* at 54).  In its supplemental brief, defendant argues that plaintiff's claim for outrageous conduct must be dismissed because she has conceded through a judicial admission that her alleged emotional distress was not "severe" but rather was "garden variety" mental stress (Dkt. # 147).

Plaintiff responds that disputed issues of fact embodied in the voluminous discovery record submitted with the parties' briefs precludes summary judgment as to each of her five claims.  As to the argument that she made a judicial admission regarding her level of emotional distress, plaintiff asserts that no such admission can be derived based on the circumstances here (Dkt. # 148).

## IV.    STANDARD OF REVIEW

The purpose of summary judgment is to determine whether a trial is necessary. *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir. 1995).  Summary judgment is appropriate under F.R.Civ.P. 56(c) only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  When applying this standard, the Court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party.  *Gray v. Phillips Petroleum Co.,* 858 F.2d 610, 613 (10th Cir. 1988).  To defeat a properly supported motion for

summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff." *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)). In addition, "where the non-moving party will bear the burden of proof at trial on a dispositive issue that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1128 (10th Cir. 1998) (citation omitted).

## V.    ANALYSIS

For the reasons set forth below, the Court agrees that summary judgment may not be entered here on the plaintiff's claim of hostile work environment under Title VII. Nor may summary judgment be entered on her claim of constructive discharge in violation of Title VII. However, her claims of discrimination resulting in an alleged refusal to transfer and reduction in job responsibilities are subject to dismissal. Summary judgment is denied as to plaintiff's claim that she was retaliated against for engaging in protected activities.

Her claim for breach of contract is not dismissed insofar as it alleges violation of workplace policies as there are disputes of material fact that must be resolved before the trier of fact. However, to the extent plaintiff may be alleging a breach of contract based on a theory that she was employed other than as an employee-at-will, such claim is dismissed. Finally, the Court finds that plaintiff has made a judicial admission that

she did not suffer "severe" emotional distress as required to state a claim for outrageous conduct under Colorado law. Therefore her Fifth Claim for Relief may be dismissed as a matter of law.

### A. Hostile Work Environment Claim

To survive summary judgment on a claim of a sexually hostile work environment, a plaintiff must show that a rational jury could find that "the workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1096 (10th Cir. 2005) (Citation omitted). To determine whether an environment is hostile, courts look at all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, quoting from *Faragher v. Boca Raton*, 524 U..S. 775, 787-89 (1998). Additionally, "[t]he conduct in question must be judged by both a subjective and an objective standard." *Id.* Facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct. *O'Shea v. Yellow Technology Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).

The Tenth Circuit has held that the "severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact." *O'Shea, supra,* 185 F.3d at 1098; *see also*

*Smith v. St. Louis Univ.*, 109 F.3d 1261, 1264 (8th Cir. 1997) ("summary judgment should seldom be used" in evaluating discrimination, specifically severity and pervasiveness of harassment), cited by the Tenth Circuit in *O'Shea*.

Here, defendant does not appear to genuinely dispute that profane language was employed in its executive suite, or that crude comments or jokes were common there. Rather, it asserts that the language was not aimed at plaintiff, that it was not necessarily gender-based, or that it should not be found to be severe or abusive, in part because plaintiff herself used "every word in the book." (Defendant's Brief at 11). Without repeating every comment and incident cited by plaintiff, and excluding those that pre-date plaintiff's EEOC charge by 300 days, it is enough to note that plaintiff has testified that in March 2004 after she sent an e-mail that displeased Mr. Kelly, he called her a "fucking stupid bitch," (Depo. of Baker, Exhibit 4 to Plaintiff's Response, at 37-38);[2] that in April 2004 company executives Kelly and Michael Dugan made multiple comments in plaintiff's presence about the breasts and body of another female employee (*id.* at 60, 72-74, 104-05); that another executive made a crude comment, which this Court will not repeat, to Suzanne Beall during an executive meeting in the presence of plaintiff (*id.* at 61, 127-28); that in May 2004 plaintiff heard Mr. Kelly telling an offensive sexual joke (*id.* at 113-14); that in June 2004 Mr. Kelly yelled at plaintiff after she spilled a soft drink in his office, calling her a "stupid idiot." *Id.* at 64.

---

[2] In referring to plaintiff's deposition testimony, the Court cites to the excerpts attached to Plaintiff's Response (Exhibit 4 thereto), in part because the page excerpts attached to Defendant's Brief (Exhibit D thereto) do not contain page numbers.

Plaintiff testified that in March 2004 she complained to Mr. Scarborough about Mr. Kelly's calling her a "fucking stupid bitch", and at "numerous" other times regarding other events or remarks (*id.* at 119-124). Plaintiff stated that Mr. Scarborough led her to believe "change was going to happen" but he apparently took no action to correct the situation (*id.* at 120-21). Mr. Kelly, on the other hand, having apparently heard of plaintiff's complaint regarding his insult of her, allegedly approached plaintiff afterwards and commented in an apparently more insulting tone "I didn't mean to piss little Sharon off." *Id.* at 59.

As the Tenth Circuit stated in *O'Shea, supra*, "[h]arassment alleged to be because of sex need not be explicitly sexual in nature (Citation omitted). . . . [F]or a hostile environment claim to survive a summary judgment motion, 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" 185 F.3d at 1097. Without detailing all the conduct asserted by plaintiff, the Court finds that she has made a sufficient showing here from which a jury could make such a finding, and therefore summary judgment as to her First Claim for Relief is denied.

### B. Discrimination in Terms of Employment

The burden-shifting framework of the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973) decision applies to determine whether plaintiff has established a *prima facie* case of gender discrimination in the terms of employment. As defendant here argues, under that structure plaintiff must show that: (1) she was within the

protected gender; (2) she was adversely affected by an employment decision; (3) defendant imposed its adverse action under circumstances giving rise to an inference of discrimination, citing to *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir, 2000) (Defendant's Brief at 32).

There is no dispute that plaintiff was in the protected class. Rather, what defendant here contends is that plaintiff did not suffer any adverse action and that she was not treated in a manner giving rise to an inference of discrimination (*id.* at 32-33). In her response to defendant's motion, plaintiff asserts that the adverse action she suffered was a constructive discharge and a denial of a requested transfer (Plaintiff's Response at 50).

1.    Constructive Discharge

With respect to her claim of constructive discharge, there is no real dispute that the loss of a job is an adverse action. Rather, what defendant argues is that plaintiff "did not lose her job" but rather she voluntarily resigned on July 7, 2004. Final Pretrial Order at 11. Plaintiff does not dispute that she turned in a letter of intent to resign, but contends the work conditions became so intolerable that she had no choice but to leave, thus she was constructively discharged.

Constructive discharge occurs when an employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. *Garrett v. Hewlett-Packard*, 305 F.3d 1210, 1221 (10th Cir. 2002) (internal quotation marks and citation omitted). The bar is quite high in such cases: a plaintiff must show she had no other choice but to

quit.  *Id.*  In determining whether an employee's working conditions would cause such feelings in a reasonable person, the court must apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent with regard to discharging her, are relevant.  *Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1270 (10th Cir. 2004). The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions.  *Id.*

Plaintiff's Response identifies various circumstances that occurred in the executive suite at EchoStar that she claims support a finding that she had no choice but to resign, including the aggressive and physical threatening acts, sexual profanity, sexual jokes and Mr. Kelly's alleged misconduct towards her (Plaintiff's Brief at 51). In addition, plaintiff testified that she complained about the working conditions, and although she was "led to believe" something would change, nothing was done (Depo. of Baker at 120-22). She testified that she requested a transfer to a position outside the executive suite but none was forthcoming (*id.* at 245; Affidavit of Baker, Exhibit 2 to Plaintiff's Response at ¶ 10).  Whether such working conditions and such employer responses were so intolerable that a reasonable person in plaintiff's position would feel compelled to resign is a question the jury will have to decide.

2.  Denial of Transfer

Plaintiff argues that a refusal to transfer an individual to another position in the face of asserted discrimination can be found to be an adverse employment action, citing to *Amro v. Boeing*, 232 F.3d 790, 797 (10th Cir. 2000) (Plaintiff's Response

at 54).  Defendant asserts that plaintiff's reliance on *Amro* is misplaced, because the Tenth Circuit there required the plaintiff to show that there were other specific jobs available for which plaintiff was qualified, and plaintiff here has failed to make such a showing (Defendant's Reply at 17).

Defendant argues that plaintiff was never denied a transfer and that Mr. Scarborough was actively seeking a transfer for plaintiff when she "walked out." Defendant's Brief at 34.  Plaintiff asserts that she approached Mr. Scarborough about a transfer to two open jobs for which she was qualified, but he told her "no" to both requests   Affidavit of Baker, Exhibit 2 to Plaintiff's Response, ¶ 10.  While defendant has cited some evidence that plaintiff continued to discuss a transfer with Mr. Scarborough even up to the day she left the company, there appears to be a dispute of material fact as to whether plaintiff was or was not denied a requested transfer.

On the other hand, plaintiff here does not offer any direct evidence that the alleged refusal to transfer was motivated by gender based discrimination.  While it may be true, as plaintiff testified, that Mr. Scarborough had apparently previously ignored her complaints about the allegedly hostile workplace environment, that alone does not permit a jury to infer that his alleged lack of response to plaintiff's transfer request was indicative of gender discrimination.  Absent some evidence that Mr. Scarborough's lack of response was motivated by gender discrimination, this aspect of plaintiff's Second Claim for Relief must be dismissed.

3. <u>Reduction in job responsibilities</u>

Plaintiff's amended complaint does not expressly plead in the Second Claim for Relief that she was discriminated against in her job responsibilities because of her gender. Defendant's Brief, however, asserts that any change in plaintiff's job duties as executive assistant was due to legitimate, non-discriminatory reasons, primarily the departure of Ms. Cartwright and plaintiff's reassignment to Mr. Kelly who employed his executive assistant in a different manner (Defendant's Brief at 34-36). The Court does not find any reply to this argument in Plaintiff's Response.

In the Final Pretrial Order, plaintiff's description of her claims for employment description refers to an alleged reduction in her job responsibilities and assignment of "only the most rudimentary and basic tasks." Final Pretrial Order at 5. However, as plaintiff has made no substantive response to defendant's showing of legitimate, non-discriminatory reasons for any change in plaintiff's job responsibilities, this aspect of plaintiff's Second Claim for Relief is dismissed.

## C. Retaliation Claim

Title VII bars employers from retaliating against an employee for engaging in a "protected activity." 42 U.S.C. § 2000e-3(a). An employee engages in a protected activity when he "has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing . . . . *Id.* Title VII's definition of protected activity is broad enough to include informal as well as formal complaints. *See Love v. RE/MAX of Am., Inc.,* 738 F. 2d 383, 387 (10th Cir. 1984).

The burden-shifting framework of *McDonnell Douglas* applies to Title VII retaliation claims. *McGarry v. Board of County Comm'rs of Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999). A plaintiff can satisfy the requirements for a *prima facie* case of Title VII retaliation by showing that (1) she engaged in protected activity, (2) there was an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action. *Sanchez v. Denver Public Schools*, 164 F.3d 527, 533 (10th Cir. 1988).

Although the Tenth Circuit liberally defines an "adverse employment action," its existence is determined on a case-by-case basis and does not extend to a mere inconvenience or an alteration of job responsibilities. *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000). To be an adverse action, the employer's conduct must be "materially adverse" to the employee's job status, *Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003).

Plaintiff alleges in her Third Claim for Relief that after she complained about the situation in EchoStar's executive suite, and after she began to act as a witness in another employee's discrimination case, defendant retaliated against her by making the working conditions worse and intolerable, thus forcing her to resign (Amended Complaint, ¶¶ 125-129).

Defendant argues it is entitled to summary judgment because: 1) plaintiff cannot show a materially adverse action taken as a result of her protected activity; 2) her resignation was voluntary; and, 3) in any event, no temporal proximity exists between

plaintiff's protected activity and her alleged constructive discharge (Defendant's Brief at 37-39). The Court rejects defendant's arguments for the following reasons.

First, as plaintiff correctly points out, case law in this circuit generally recognizes that co-worker hostility or retaliatory harassment, if sufficiently severe, can constitute adverse employment action for purposes of a retaliation claim. *Gunnell v. Utah Valley State College,* 152 F.3d 1253,1264 (10th Cir. 1998). In this case, where some of the alleged hostility and retaliatory harassment is alleged to have emanated from plaintiff's supervisor, Mr. Kelly, there can be little question that such action is adverse if proven. Moreover, since the plaintiff alleges that the retaliatory harassment was so severe as to force her to resign her position, the analysis is essentially the same as under her constructive discharge claim, which the Court has already determined to be an adverse action as discussed above.

Plaintiff also points out the alleged retaliatory harassment from Mr. Kelly occurred on the same day she complained to Mr. Scarborough about Mr. Kelly's addressing her as a "fucking stupid bitch." Depo. of Baker at 59. She also asserts that after complaining, Messrs. Kelly and Scarborough "blocked [her] efforts" to transfer away from the executive suite (Plaintiff's Response at 57). As noted above, she has sworn that she approached Mr. Scarborough with two job openings, but both times he refused to transfer her (Affidavit of Baker, Exhibit 2 to Plaintiff's Brief at ¶ 10). Although she does not specify the precise dates of these occurrences, it appears that at least one occurred in June 2004 (Depo. of Baker at 254) and she contends that such efforts continued through the time she decided to submit her resignation on July 7, 2004,

leading her to conclude that she had no choice but to resign (Affidavit of Baker, Exhibit 2 to Plaintiff's Brief at ¶ 11).  Viewing this evidence in a light most favorable to the non-moving party, the Court cannot say that plaintiff has failed to meet her burden to show a temporal proximity between her complaints and the alleged retaliatory conduct. To the extent plaintiff's Third Claim for Relief asserts retaliation that left her with no choice but to resign, the claim cannot be dismissed at this stage of the case.

### D.    Breach of Contract Claim

In her Fourth Claim for Relief, plaintiff alleges that policies and procedures set forth in the EchoStar employee handbook dated October 1997, and reiterated in revisions thereto, created an implied contract which defendant arguably breached by permitting the harassment and retaliation discussed above (Amended Complaint at ¶¶ 136-141).  It is not clear to the Court whether plaintiff also claims the handbook modified what was otherwise an employee-at-will relationship.  The amended complaint does not set forth the specific policies and procedures, but they are found in the attachments to the parties' briefs.

One of the policies set forth in the Employee Handbook is titled "Equal Employment Opportunity" and provides that:

> EchoStar . . . provides equal employment opportunities (EEO) to qualified employees and applicants . . . without regard to race, sex, age, national origin, disability or veteran status. This applies to recruitment, hiring, compensation, promotion, training, layoff, transfer, leaves of absence and termination.  EchoStar does not condone discrimination or unfair treatment of any kind.  It is the responsibility of each employee to report to a manager or to the Human Resources Department any discriminatory or unfair practices, regardless of whom they impact.

Exhibit F to Defendant's Brief at 5.

Another of the policies, titled "Protection from Unlawful Harassment" states:

It is the policy of EchoStar that all employees should be able to enjoy a work atmosphere free from all forms of illegal discrimination or conduct including sexual harassment.

Harassment is defined as unwelcome or unsolicited verbal, physical, or sexual conduct which (a) is made a condition of employment; (b) is used as a basis for employment decisions; or (c) creates an intimidating, hostile or offensive workplace.

Examples of what may be harassment, depending on the circumstances, are:

• Verbal harassment – derogatory or vulgar comments regarding a person's race, sex, religion, ethnic heritage, disability or distribution of written or graphic material having such effects;

• Physical harassment – hitting, pushing or other aggressive physical conduct or threats to take such action;

• Sexual harassment, unwelcome or unsolicited sexual advances, demands for sexual favors or other verbal or physical conduct of a sexual nature.

EchoStar does not tolerate or condone any form of retaliation or reprisal against an employee who has made a good faith complaint of harassment or discrimination. All claims regarding these types of harassment will be treated confidentially to the extent that confidentiality is consistent with a thorough investigation of the reported incident. If an employee believes that he/she has been subjected to any of these forms of unlawful harassment it is his/her responsibility to contact a supervisor or the Human Resources Department immediately. If an investigation confirms the offense, immediate disciplinary action up to and including termination may be taken against the person violating this policy.

Ex. F to Def's Brief at 6.

The Handbook also has a policy titled "Threats and Violence," which provides:

EchoStar seeks to maintain a work environment free from intimidation, threats or violent acts. This includes, but is not limited to, intimidating, threatening or hostile behaviors, physical abuse . . . . If an employee feels he/she or any co-worker has been subjected to any of the behaviors

listed above, he/she is requested to immediately report the incident to a supervisor or the Human Resources Department.  Complaints will be investigated.

Ex. F to Def's Brief at 6.

Plaintiff also cites to the concluding page of the handbook which provides, in

pertinent part:

[T]he Company will not tolerate demonstration of the following behaviors:

Abusive or threatening verbal or physical acts against, or in the presence of customers or employees.

Sexual or other prohibited forms of harassment of employees or visitors.

.   .   .

Rude or insolent conduct, causing a disturbance or exhibiting unbusinesslike behavior.

Violating any EchoStar procedure, rule, regulation, system, standard or guideline whether in this Handbook, posted or communicated in training materials, verbally, in memo form or observed in practice.

Ex. 24 to Plaintiff's Brief at 8.

As noted above, defendant asserts that these provisions of the handbook do not

create a contract, citing to the provision found in the introduction which states the

handbook "is intended as an introduction to our Company's philosophy, guidelines and

benefits. . . .  The guidelines stated in this Handbook are subject to change at any time,

with or without notice, at the sole discretion of the Company" (Exhibit F to Defendant's

Brief at 3).  The defendant also cites to the so-called disclaimer which provides in

pertinent part:

**<u>IMPORTANT</u>**

THE HANDBOOK IS NOT ALL INCLUSIVE, BUT IS INTENDED TO PROVIDE A SUMMARY OF SOME OF THE COMPANY'S GUIDELINES.

THE LANGUAGE USED IN THIS HANDBOOK DOES NOT CREATE OR CONSTITUTE A CONTRACT OF EMPLOYMENT WITH ANY EMPLOYEE, EITHER EXPRESS OR IMPLIED. EMPLOYMENT IS AT WILL; THEREFORE, EMPLOYEES HAVE THE RIGHT TO END THEIR EMPLOYMENT RELATION-SHIP WITH THE COMPANY WITH OR WITHOUT ADVANCE NOTICE OR CAUSE. MANAGEMENT RESERVES THE RIGHT, WITH OR WITHOUT CAUSE TO TERMINATE THE EMPLOYMENT OF ANY EMPLOYEE AT ANY TIME.

THE INFORMATION CONTAINED IN THIS HANDBOOK IS FOR GENERAL INFORMATION ONLY. . . . ALSO, THE NEED MAY ARISE TO CHANGE THE GUIDELINES DESCRIBED IN THE HANDBOOK. THE COM-PANY THEREFORE RESERVES THE RIGHT TO MAKE FINAL DECISIONS, INTERPRET AND APPLY THEM OR TO CHANGE OR DISCONTINUE THEM AT ANY POINT WITHOUT PRIOR NOTICE.

*Id*. at 4. (Upper case in original).

Defendant also points out that plaintiff signed a receipt for the company

handbook dated November 11, 1998 which states:

I further understand that my employment is terminable at will so that the Company and I remain free to choose to end our work relationship at any time, with or without advance notice or cause. I also understand this Handbook is for general information only, and represents brief summaries of Company guidelines which are subject to change or discontinuance at any time without prior notice. . . .

Finally, I understand that nothing in this Handbook in any way creates an express or implied contract of employment between Company and me."

Exhibit I to Defendant's Brief.

Under applicable Colorado law, guidelines contained in an employee handbook

providing that an employer will not engage in discrimination, and is committed to

providing a "fair and equitable working environment," may create an enforceable

contract if the employee can prove all the elements of the formation and breach of

a contract. *Tuttle v. ANR Freight System, Inc.*, 797 P.2d 825, 827 (Colo. App. 1990).

*Tuttle* also holds that "whether an employer and employee have entered into a contract based upon an employee handbook is generally a question of fact for the jury, [a]nd whether the parties intended to enter a contract is a factual question." *Id.* (Citations omitted). However, whether there is an implied contract "may be decided as a matter of law if the alleged promises are nothing more than '"vague assurances."'" *Vasey v. Martin Marietta*, 29 F.3d 1460, 1464 (D. Colo. 1994) citing *Dupree v. United Parcel Service*, 956 F.2d 219, 222 (10th Cir.1992).

Relying on *Vasey* and cases with like holdings including *Marsh v. Delta Air Lines, Inc.*, 952 F. Supp 1458 (D. Colo. 1997), defendant here contends that the anti-harassment, anti-discrimination and tolerance policies set forth in its employee handbook are nothing more than vague assurances that cannot give rise to an implied contract. This Court does not agree.

In *Vasey*, the employer's statements consisted of a few general phrases such as the employer "believes in the highest ethical standards," is committed "to just management and equality for all ... and respecting the dignity and privacy due all human beings" and to "providing a safe and healthy workplace." *Vasey, supra*, 29 F.3d at 1465. By contrast, the provisions in EchoStar's handbook sets forth specific conduct that is defined as harassment, outlines the prohibition against threats and violence, provides procedures for the employee to address such situations, concludes that such conduct will not be tolerated or condoned, and specifies that the company "will take action" and impose discipline in the event of a finding of prohibited conduct. Unlike the code of conduct at issue in *Marsh, supra,* 952 F. Supp at 1466-67, the EchoStar

handbook does explain the disciplinary procedures and does detail the prohibited conduct. Thus, this Court finds that EchoStar's handbook does contain statements "that can reasonably be relied upon" by employees and the "employer's statement [is] sufficiently definite to allow a court to understand the nature of the obligation undertaken." *See Haynes v. Level 3 Communication, LLC,* 167 Fed. Appx. 712, 715 (10th Cir., Jan. 19, 2006).

Defendant further argues that even if the policies could be found definite enough to be the basis of an implied contract, the so-called disclaimer found in the handbook negates the potential to form a contract. In this Court's reading, the so-called disclaimer set forth above is fairly read to relate to the issue of whether or not the handbook modifies the employment-at-will relationship. It states that the handbook "does not create a contract of employment with any employee, express or implied" followed immediately by the statement "[e]mployment is at will." Exhibit F to Defendant's Brief at 4. The Court finds that a reasonable reading of the disclaimer is that it precludes the handbook provisions from altering the employment-at-will relationship, but the disclaimer does not preclude the other provisions of the handbook from being relied upon by the employees. This disclaimer is very similar to the one discussed in *Duran v. Flagstar Corp.*, 17 F. Supp.2d 1195, 1201 (D. Colo. 1998), where Chief Judge Babcock found that "the disclaimer applied to the term of employment-not the conditions of employment."

To the extent plaintiff's claim here may be that the handbook constituted a contract modifying her at-will employee relationship with Echostar, the Court finds that the disclaimer precludes such a claim. But, to the extent plaintiff's claims here relate to

the conditions of her employment other than the term of employment, such as the anti-discrimination, anti-harassment and toleration policies referenced above, summary judgment on the basis of the disclaimer alone will not be entered.

Defendant further appears to argue that plaintiff could not have reasonably relied on the handbook to believe she was entering into a contract binding on the defendant in any respect, since she signed the acknowledgment referenced above which states that she understood that the handbook does not create a contract (Exhibit I to Defendant's Brief). Defendant, however, cites no case which holds that an employee's acknowledgment such as that shown here precludes her as a matter of law from arguing that her reliance on a handbook was nonetheless reasonable. The Court notes that the acknowledgment form signed by plaintiff, like the disclaimer discussed above, appears to refer primarily to preserving the employment-at-will relationship, and not necessarily to the policies regarding the conditions of employment. Although this signed statement suggests that plaintiff perhaps should not have perceived the handbook to be a contract of employment, whether her reliance on the handbook as a modification of the employer-employee relationship was reasonable is generally a question of fact. *See Cronk v. Intermountain Rural Elec. Ass'n,* 765 P. 2d 619, 623 (Colo. App. 1988).

Accordingly, defendant's motion for summary judgment as to plaintiff's Fourth Claim for Relief is denied to the extent the claim is based on breach of provisions in the employee handbook relating to conditions of employment, including the anti-discrimination, anti-harassment and toleration policies.

### E.    Outrageous Conduct Claim

Plaintiff's Fifth Claim for Relief alleges that defendant's conduct, referencing specifically the actions of the outside attorneys who sought to obtain her affidavit, amounts to outrageous conduct under Colorado law with the intent of causing "severe emotional distress."  Amended Complaint, ¶ 146.  Plaintiff alleged that as a result of these actions, she suffered "severe emotional distress."  *Id.*, ¶ 148.

As stated by the Tenth Circuit in *Riske v. King Soopers*, 366 F.3d 1085, 1089 (10th Cir. 2004) "[i]n Colorado, '[t]he elements of outrageous conduct are: (1) the defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress.'"  (Citations omitted).  According to the pattern Colorado Jury Instructions, severe emotional distress consists of highly unpleasant mental reactions, such as nervous shock, fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, or worry, and is so extreme that no person of ordinary sensibilities could be expected to tolerate and endure it.  The duration and intensity of emotional distress are factors to be considered in determining its severity.  CJI 23:4.

Defendant's summary judgment motion argues, *inter alia*, that plaintiff did not suffer severe emotional distress, so that as a matter of law she may not prevail on this claim (Defendant's Brief at 54-55).  Plaintiff alleged in her amended complaint that she suffered "severe emotional distress" and argued as much in her opposition to summary judgment.

However, in a motion *in limine* filed June 8, 2007 (Dkt. # 117) plaintiff argued that since her claim for emotional distress can be described as a "garden variety" claim for

such damages, certain medical records obtained by defendant should be precluded from admission at trial (Dkt. # 177 at 1). More specifically, plaintiff argued that her medical records and testimony relating to plaintiff's "psychological state of mind," should not be admitted at trial because, as in other cited cases where such records are not permitted as evidence, her claim for emotional distress is "only a 'garden variety' claim for emotional distress and admission of such evidence is not necessary to prove a 'garden variety' claim for emotional distress." *Id.* at 7-10.

In response to the motion *in limine*, defendant expressly argued that plaintiff had put into issue whether her alleged emotional distress was severe, as opposed to "garden variety," by pleading her claim for outrageous conduct (Dkt. # 134 at 2; 7-8). Plaintiff's reply (Dkt. # 140), filed July 23, 2007, does not appear to address this argument, simply stating that medical records or medical testimony are not required to prove claims of emotional distress, citing to *Allabashi v. Lincoln Nat'l Sales Corp.*, 824 P.2d 1, 4 (Colo. App. 1991) and *Smith v. Hoyer*, 697 P. 2d 761, 765 (Colo. App. 1984) (Dkt # 140 at 7). But, as plaintiff's reply acknowledges, neither of those cases addresses claims of outrageous conduct leading to severe emotional distress, but rather claims of "mental anguish" arising from alleged willful and wanton breaches of contract. Plaintiff's Fifth Claim for Relief in this case is not seeking damages for mental anguish arising out of a wilful and wanton breach of contract, but rather asserts the tort claim of outrageous conduct described above. An outrageous conduct claim is not a claim where garden variety damages are sufficient, but as noted above requires proof of "severe emotional distress."

In response to defendant's supplemental brief, plaintiff argues that the statements in her motion *in limine* should not be characterized as judicial admissions (Dkt. # 148 at 3-7). However, as the Tenth Circuit stated in *Guidry v. Sheet Metal Workers Int'l. Assn.*, 10 F.3d 700, 716 (10th Cir. 1993), a case on which plaintiff relies, statements made in a party's brief may considered a judicial admission at the discretion of the court. Moreover, in the same case the court stated that propositions of law are not subject to judicial admission. *Id.* Rather, judicial admission occurs when a party makes a formal admission having the effect of withdrawing a fact from issue. *Id.*

Here, plaintiff has taken the position in her motion that certain medical records should not be admitted at trial because the emotional distress she is intending to prove is "garden variety" emotional distress. In so arguing, plaintiff is in effect withdrawing, or at least impeding defendant from challenging, the fact issue of whether she suffered severe emotional distress. In this Court's exercise of discretion, the statements in her motion *in limine* and reply brief can be found to be judicial admissions. Plaintiff not only argued the issue in her motion *in limine*, but when confronted directly in defendant's response with the effect of her admission, did not withdraw or modify her position. The Court recognizes that counsel may have been seeking to protect his client's medical records. Nonetheless, the admission was made and it was held to in the face of an opportunity to withdraw it. Given plaintiff's argument that she suffered only garden variety emotional distress, her claim for outrageous conduct must be dismissed.

**CONCLUSION**

Defendant's Motion for Summary Judgment (Dkt. #64) is GRANTED in part and DENIED in part.

It is DENIED entirely as to the First Claim for Relief.

It is GRANTED, in part, as to the Second Claim for Relief, as plaintiff has not shown that the alleged denial of a transfer resulted from a discriminatory animus, or that any alleged reduction in job responsibilities was a pretext for discrimination. It is DENIED to the extent she alleges employment discrimination resulting in a constructive discharge.

It is DENIED as to the Third Claim for Relief to the extent it alleges retaliation for engaging in a protected activity leading to her asserted constructive discharge.

It is DENIED as to the Fourth Claim for Relief to the extent the claim alleges breach of contract arising from provisions in the employee handbook relating to conditions of employment, including the anti-discrimination, anti-harassment and toleration policies. It is GRANTED to the extent the Fourth Claim for Relief may be based on a modification of the employment-at-will relationship.

It is GRANTED as to plaintiff's Fifth Claim for Relief.

DATED: December 4, 2007

BY THE COURT:

*s/ Phillip S. Figa*

_____
Phillip S. Figa
United States District Judge